**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

| | | |
|---|---|---|
| | ) | |
| **D.B., a minor, by his next friends,** | ) | |
| **ELIZABETH B. and DAVID B.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.** |
| | ) | **07-cv-40191-FDS** |
| **v.** | ) | |
| | ) | |
| **KIRSTEN ESPOSITO, CECILIA** | ) | |
| **DiBELLA, SUTTON SCHOOL DISTRICT,** | ) | |
| **SUTTON SCHOOL COMMITTEE, and** | ) | |
| **the MASSACHUSETTS DEPARTMENT** | ) | |
| **OF EDUCATION,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____)

**MEMORANDUM AND ORDER ON**
**CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

**SAYLOR, J.**

This is a civil action concerning the appropriateness of an individualized education program ("IEP") that the Sutton School District designed and implemented for D.B., a disabled child. D.B.'s parents have filed suit as next friends of their son under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1415.[1] Plaintiffs seek review of the decision of an independent hearing officer ("IHO") of the Massachusetts Board of Special Education Appeals ("BSEA") concluding that Sutton provided D.B. with a free appropriate public education ("FAPE") as required by the statute. *See id.* § 1412(a)(1)(A).[2]

---

[1] Although D.B. himself is nominally the party in this action, the Court will refer to the family collectively as "plaintiffs."

[2] Plaintiffs have also raised claims under, among other things, 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act of 1973. Those claims are not before the Court at this time.

All parties have moved for partial summary judgment on the question of the propriety of the decision by the IHO.[3]  For the reasons set forth below, plaintiffs' motions will be denied and defendants' motions will be granted.

## I.   The Statutory Framework

The IDEA conditions the provision of federal funds to state schools on compliance with its requirements.  "To receive federal money, a state must provide all handicapped children with 'a free appropriate public education.'"  *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 987 (1st Cir. 1990) (quoting 20 U.S.C. §§ 1400(c), 1414(b)(2)(A), 1416)).  "Substantively, the 'free appropriate public education' ordained by the Act requires participating states to provide, at public expense, instruction and support services sufficient 'to permit the child to benefit educationally from that instruction.'"  *Id.* (quoting *Board of Educ. v. Rowley*, 458 U.S. 176, 203 (1982)).

### A.   Individualized Education Programs

The IEP is the statute's primary safeguard for assuring the provision of free appropriate public education to handicapped children.  The IEP "compiles information and goals anent a particular student's educational progress.  It must include statements about the child's current performance, long-term and short-term instructional targets, and objective criteria for measuring the student's advance."  *Id.* (citing 20 U.S.C. § 1401(19); 34 C.F.R. § 300.346).

IEPs are formulated through the participation of a team that includes the student's parents, at least one of the student's regular education teachers (if any), at least one special

---

[3] Plaintiffs have actually filed two motions and supporting memoranda for partial summary judgment, one styled as "supplemental."  All references to plaintiffs' memorandum are to the amended or "supplemental" memorandum.

education teacher, a representative of the local education agency, and an individual who can

interpret the instructional implications of evaluation results. *North Reading Sch. Comm. v. BSEA*,

480 F. Supp. 2d 479, 482 n.5 (D. Mass. 2007). "Each IEP must include an assessment of the

child's current educational performance, must articulate measurable educational goals, and must

specify the nature of the special services that the school will provide." *Schaffer ex rel. Schaffer v.

Weast*, 546 U.S. 49, 53 (2005).

> There is no mechanical checklist by which an inquiring court can determine the
> proper content of an IEP; IEPs are by their very nature idiosyncratic. One thing is
> clear: the substance of an IEP must be something different than the normal school
> curriculum and something more than a generic, one-size-fits-all program for
> children with special needs.

*Lessard v. Wilton-Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 23 (1st Cir. 2008) (internal

quotation and citation omitted). IEPs must be reviewed annually and revised when necessary.

*Roland M.*, 910 F.2d at 988.

"If complaints arise, the state must convene 'an impartial due process hearing.' In the

Commonwealth, this function is performed by the BSEA. The hearing's outcome is reviewable in

either state or federal court, and the reviewing tribunal has broad discretion to grant appropriate

relief." *Id.* at 987-88 (quoting 20 U.S.C. § 1415(b)(2)).

## B.      **Appropriateness and Adequacy**

It is important to emphasize at the outset that the IDEA does not require perfection.

> The IDEA does not promise perfect solutions to the vexing problems posed by the
> existence of learning disabilities in children and adolescents. The Act sets more
> modest goals: it emphasizes an appropriate, rather than an ideal, education; it
> requires an adequate, rather than an optimal, IEP. Appropriateness and adequacy
> are terms of moderation. It follows that, although an IEP must afford some
> educational benefit to the handicapped child, the benefit conferred need not reach
> the highest attainable level or even the level needed to maximize the child's

potential.

*Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1086 (1st Cir. 1993) (citing *Rowley*, 458 U.S. at

198; *Roland M.*, 910 F.2d at 992).[4]

> A school system has met this obligation as long as the program that it offers to a
> disabled student is 'reasonably calculated' to deliver 'educational benefits.'  At
> bottom, this obligation is an obligation to provide an adequate and appropriate
> education.  The IDEA does not place school systems under a compulsion to afford
> a disabled child an ideal or an optimal education.

*C.G. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279, 284 (1st Cir. 2008) (quoting *Rowley*, 458 U.S.

at 207).

### C.    Least Restrictive Environment

"The IDEA . . . articulates a preference for mainstreaming," that is, educating disabled

students with non-disabled students as much as possible.  *Lenn*, 998 F.2d at 1086 (citing 20

U.S.C. § 1412(5) (requiring states to educate handicapped and non-handicapped children together

"to the maximum extent appropriate")).  "Translated into practical application, this preference

signifies that a student who would make educational progress in a day program is not entitled to a

residential placement even if the latter would more nearly enable the child to reach his or her full

potential."  *Id.* (internal quotations and citations omitted).

## II.   Background

### A.    D.B.'s Developmental Disorders

D.B. is a child who lives in Sutton, Massachusetts.  He was born in September 1996, and

is now 13 years old.

---

[4] Massachusetts had previously adhered to the higher standard of "maximum possible development" before adopting the federal standard of "free appropriate public education," effective January 1, 2002.  *See* Mass. Gen. Laws ch. 71B; *Wanham v. Everett Pub. Schs*, 550 F. Supp. 2d 152, 158 (D. Mass. 2008).

There is no dispute that D.B. is handicapped within the meaning of the IDEA.  When he was three months old, he developed a seizure disorder and infantile spasms.  As a result, he has suffered significant developmental delays in all areas, particularly in language skills and cognition.

D.B. has been diagnosed with severe verbal apraxia and dysarthria.  Verbal apraxia is a disorder of motor speech planning and programming in which the neurological signals between the brain and the speech-producing muscles are not transmitted effectively.  As a result, a child with apraxia has difficulty learning how to produce and sequence sounds.  Dysarthria is characterized by hypotonia and muscle weakness.  D.B. has dysarthria associated with his speech-producing muscles, which interferes with his ability to produce certain sounds.

Because of its severity, D.B.'s disability exerts a pervasive impact on his educational progress, affecting speech, expressive communication, receptive communication, literacy and reading, social interaction, focus and attention, behavior, and general cognitive development.  He also has significant motor and sensory processing challenges.

Because any assessment of his true potential is complicated by his communication disorders, D.B's actual cognitive abilities are the subject of some dispute.

### B.      History of Services in the Sutton Schools

#### 1.      1996-2002

When he was about four months old, D.B. began receiving early intervention services to address delays in a variety of areas, including cognition, gross and fine motor skills, and receptive and expressive communication.  D.B. transitioned into the Sutton School District when he was three years old.  After a diagnostic placement, Sutton recommended that D.B. continue to receive services in the preschool to address his developmental delays.  His first IEP was prepared at that

time.  While he could follow some simple, one-part directions and was beginning to imitate some sounds, D.B. was still non-verbal.  There were also problems with his receptive language and comprehension.  He could respond to his name, look at his classmates when their names were called, imitate some actions in songs and games, and use ordinary objects appropriately.  However, he had difficulty pointing to body parts, picking out an object from a group, and matching and sorting objects.  He was also highly distractible.

In addition to the programs available at Sutton, D.B.'s parents sought out and funded additional placements that provided, among other things, intensive daily speech language therapy.  As a result of progress he made in the supplemental placements, D.B.'s parents urged Sutton to increase the services they were providing, including the adoption of a more intensive, total communication approach that would expose D.B. to other means of communication, such as sign language and augmentative systems.  A picture exchange communications system ("PECS") was also adopted.[5]  In addition, Sutton provided D.B. with a one-on-one aide.

Because D.B.'s speech abilities were still extremely limited, in late 2001 and early 2002 Sutton and D.B.'s parents also explored technologies that could help him to communicate.  At the time, D.B. could produce a limited number of word approximations.  He used some signs expressively, but many of them were modified or mildly distorted.  He could nod or shake his head to indicate "yes" or "no" or use facial expressions to show emotions.  He could use PECS to label and make choices but not to make a request, gain attention, express his feelings or interests, or comment on unseen items.  Pursuant to an augmentative communication evaluation by Lori A.

---

[5] PECS is an augmentative communication system that uses pictures instead of words to help non-verbal children communicate.

Buxton, a speech language pathologist, the parties ultimately settled on the DynaMyte 3100, a touch-screen programmable device with a digital output voice that can be utilized by apraxic children as a means of communication.  Ultimately, however, D.B.'s use of the DynaMyte device was consistently problematic.

During the summer of 2002, D.B. attended summer school, where he received speech, occupational therapy, and physical therapy services.  His parents provided him with additional speech therapy services at Worcester State College.

### 2.     2002-2003 School Year

Beginning in September 2002, D.B. entered full-day kindergarten.  At the time, he was almost six years old.  Pursuant to a new IEP, each morning D.B. would have both one-on-one speech and language therapy with Jane Oleksyk, a certified speech/language pathologist, focusing on his apraxia, and one-on-one sessions with Elaine Valk, a speech language assistant, focusing on his overall communication skills.  D.B. also received instruction in sign language and on the use of the DynaMyte, with Ms. Buxton as a consultant.  In the afternoons, D.B. joined a regular kindergarten class.

In December 2002 and January 2003, Sutton conducted a three-year evaluation of D.B.'s progress, consisting of neuropsychological, physical therapy, occupational therapy, and speech/language assessments.  The neuropsychological assessment, which was prepared by Dr. Miriam Sexton, revealed that D.B.'s developmental skills ranged from the two-year, three-month level, to the three-year, four-month level.  The speech language assessment, conducted by Ms. Oleksyk, showed that D.B. continued to have severely impaired speech and language skills, consistent with his apraxia and dysarthria.

Following the assessment, Sutton prepared a new IEP for D.B. covering the period January 2003 to January 2004.  Under the new IEP, D.B. continued to spend half his days in a regular classroom with support and half in a substantially separate setting receiving one-on-one services.  In addition to the services provided by Sutton, D.B. also received supplemental speech and language therapy paid for by his parents.  Over the summer of 2003, D.B.'s parents provided him with additional speech and language therapy with Amy C. Kulcsar, a certified speech/language therapist.

### 3.     The 2003-2004 School Year

D.B. remained in Sutton's kindergarten for the 2003-2004 school year.  He received the same range of services in the same partial inclusion program.  However, he now also received some of his academics in a small group within the classroom taught by a special education teacher.  Again D.B. participated in a summer program, including a one-on-one instructional assistant, as well as occupational and physical therapy.

At the time, D.B.'s parents requested that Sutton pay for the supplemental speech therapy provided by Ms. Kulcsar.  They recognized that D.B. was making "solid and exciting" progress in some areas, but contended that he was not receiving sufficient services "to give him meaningful access to the general school curriculum."  (AR at 4444).  Sutton maintained that D.B.'s current level of services was "comprehensive and appropriate" and that an extended day was unnecessary. (AR at 4451).  It therefore did not include the supplemental speech services in the proposed February 2004 IEP.  As a result, D.B.'s parents partially rejected the IEP, although they accepted his placement.  Ultimately, the parties settled their differences, and Sutton agreed to pay for speech/language therapy by Ms. Kulcsar during D.B.'s summer program as well as an

independent speech/language evaluation.

### 4. <u>Introduction to Lindamood-Bell</u>

D.B.'s parents enrolled him in the Lindamood-Bell Learning Center in Arlington,

Massachusetts, for a six-week course at the end of the summer of 2004. Lindamood-Bell is a

private vendor of language and literacy-related services that utilizes several different proprietary

programs and methodologies designed to help individuals with language-based disabilities acquire

some of the sensory cognitive processing skills necessary to develop language and literacy skills.

Lindamood-Bell provides intensive, one-on-one tutorial services that assess and target individual

needs in these categories. D.B. experienced some success at Lindamood-Bell during the summer

of 2004, but he had to begin at a very elementary level and his progress was very slow.

### 5. <u>The 2004-2005 School Year</u>

D.B. finally started first grade in September 2004, when he was almost eight years old.

He received the same level and variety of services as he had the previous year, but spent increased

time in his regular classroom. He also continued to receive private, after-school speech and

language therapy from Ms. Kulcsar, paid for by his parents. As the parties had agreed, D.B.

underwent a speech and language evaluation at the beginning of the academic year conducted by

an independent speech pathologist, Teresa Dooley-Smith. Ms. Dooley-Smith noted that D.B.

already had received "a tremendous amount of speech and language support." She observed that

D.B. used predominately one-word utterances with some two-word utterances, but that he was

most comfortable signing. Ms. Dooley-Smith made a series of recommendations regarding the

services being provided to D.B.

### C. <u>The February 2005 IEP</u>

After receiving Ms. Dooley-Smith's report, Sutton convened a series of meetings to develop D.B.'s proposed IEP for the period February 2005 through February 2006.  According to the new IEP, D.B. had developed a repertoire of 117 words that were easily understood by his teachers and he could identify numbers from 1-15 by rote.  He could also use two-to-four word phrases and sentences with cues and modeling.  In addition, he could say the names of several friends and identify the letters in his name.  The accuracy of D.B.'s performance levels as reported in the IEP is disputed by his parents.

The IEP indicated that D.B.'s level of services would remain roughly the same.  In addition, it integrated some, but not all, of Ms. Dooley-Smith's recommendations.  For example, the IEP stated that D.B. would receive language-based, multi-sensory instruction both one-on-one and within a small group.  In terms of social skills, the IEP recognized that D.B. needed to become less dependent on adults and more engaged with his peers.  The IEP also noted the need for assistive technology to help him communicate more spontaneously with his peers.

In addition, the IEP indicated that D.B. would be placed in Sutton's Language Based Resource Program.  That program is designed for students "who benefit from a smaller group, high language support, integrated therapy consultation, and [a] curriculum modified and aligned" to Sutton's curriculum framework.  Instruction in the Language Based Resource Program is delivered in small group or individualized sessions.  Although their profiles varied, the other students in the classroom also had learning and neurological disabilities.  The IEP stated that the existing curriculum would be modified to address D.B.'s specific needs and that he would receive diagnostically driven, language-based, multi-sensory instruction.

### D.    D.B.'s Removal from Sutton

The 2005-2006 IEP was never implemented.  Instead, D.B.'s parents removed him from the Sutton schools, effective March 2, 2005.  They enrolled him in the Lindamood-Bell Center, where he received four hours of one-on-one instruction every day.  His parents later added additional programming, including physical and occupational therapy, and various recreational and instructional programs at the Beverly School for the Deaf.  D.B. has not returned to the Sutton schools since his removal in March 2005.

E.    **Proceedings before the BSEA**

On March 1, 2005, Sutton filed a hearing request with the BSEA.  Sutton contended that the IEP it had developed for D.B. provided him with a FAPE and requested a finding that it was not required to reimburse D.B.'s parents for the cost of the Lindamood-Bell program.  D.B.'s parents counterclaimed, contending that Sutton's proposed IEP did not provide D.B. with a FAPE and that Sutton therefore should reimburse them for D.B.'s educational expenses from March 2, 2005 forward.[6]  A hearing was held over eight non-consecutive days between June 28, 2006, and October 12, 2006.  Both parties were represented by counsel and had an opportunity to present documentary evidence and witness testimony as well as to cross-examine the other party's witnesses.  The IHO received more than 300 exhibits and heard testimony from sixteen witnesses: Kirsten A. Esposito, the Special Education Director for Sutton; Elaine Valk, a speech/language pathology assistant employed by Sutton; Jane Oleksyk, a speech/language pathologist employed by Sutton; Cynthia J. Beaudoin, an occupational therapist employed by Sutton; Gina DeCaro, a special education teacher employed by Sutton; Tracy Kolofsky, a first grade teacher employed by

---

[6] Although D.B. left Sutton in March 2005, a new IEP was formulated in June 2005.  For reasons discussed below, all developments that occurred after D.B.'s withdrawal, including Sutton's consideration of an outside placement for D.B. at the Cotting School, are not properly before the Court.

Sutton; Ellen Honeyman, an educational consultant; Dr. Shelley Velleman, a speech/language

pathologist; Jasmine Urquhart, a speech/language pathologist; Kathy Carley, an occupational

therapist; Tara Reynolds, a clinician at Lindamood-Bell; Naomi Chedd, an educational consultant;

Jennifer Yovino, a private tutor; Dr. Marsha Chaskelson, a psychologist; and both of D.B.'s

parents.

On March 26, 2007, the IHO issued a decision that included extensive findings of fact.

She determined that the IEP provided D.B. with a FAPE and that Sutton was not required to

reimburse D.B.'s parents for his educational expenses.  The IHO's essential conclusions are as

follows:

> There is ample evidence on the record that from the time Student entered the
> Sutton Public Schools in 1999 until he was removed in 2005 that he made slow but
> measurable progress in all identified areas of need, generally meeting most or all of
> his IEP goals. . . .
>
> The record demonstrates that Student was making steady progress during
> 2004-2005, his final academic year in Sutton, slowly increasing his ability to
> function in the classroom, communicate, and make academic progress, but [Ms.]
> Dooley-Smith's report was persuasive that Student should be placed in a smaller,
> specialized classroom to enable him to do more group learning.
>
> Student's progress was meaningful.  Despite enormous challenges, Student
> developed from a child who did not speak at all and only had access to a few signs
> to a child who could communicate many of his wants and [needs] via sign, spoken
> words, and emerging use of augmentative communication, who was developing
> pre-reading skills, whose physical skills had improved enormously.  There is no
> reason to believe that Student would not have made continued, and likely more
> rapid progress in the newly-proposed program. . . .
>
> [S]ince Student turned 3, Sutton has provided him with comprehensive, detailed
> IEP and proposed placements in partial inclusion programs.  Moreover, the IEP at
> issue here would have provided Student with classroom placement that was small
> and structured enough to increase Student's actual participation as a classroom
> member while also continuing to provide individualized instruction and therapies.
> The proposal followed from the evaluation of [Ms.] Dooley-Smith, and

incorporated most of her salient recommendations.

I note further that Parents fully participated in and provide tremendous input into developing and implementing Sutton's programs and services, up to and including the final IEP.  Moreover, Sutton was consistently willing to adjust service delivery to Student's evolving needs. . . .

In reaching the foregoing conclusion, I relied on the testimony of the teachers and therapists from Sutton who had worked with Student for several years, some since he was three years old.  I found their testimony to be candid and persuasive.  I relied also on reports that documented progress that was not always consistent, and services that often had to be adjusted, but that overall painted a picture of a child with slowly but steadily improving ability to communicate and function both within and outside of the classroom.

On the other hand, I was not persuaded by the conclusions of Drs. Velleman and Chaskelson, that Student must be educated on an exclusively 1:1 basis until he acquires functional verbal language, at which time he can socialize with others in a meaningful way.  Neither of these experts had ever observed Student in his class in Sutton, or had observed the proposed program.  Moreover, the recommendations did not account for two important factors.  The first is Student's strength in the social-emotional domains, his ability and desire to relate to peers, his history of being motivated by peers, and his growing ability to ignore distraction in the academic setting.  The second is the consistent recommendations for a total communication approach for Student, coupled with Student's skill as a "total communicator."  Both of these experts seemed to discount Student's ability to sign, albeit imperfectly, use pictures, and otherwise communicate without total reliance on speech, and did not adequately explain their departure from the unanimous past recommendation for total communication, in favor of even heavier concentration on speech development. . . .

Student's progress is uneven and difficult to measure accurately regardless of the settings he is in . . . .  If the record shows anything, it is that there is no one methodology or approach that is the sole approach capable of providing Student with FAPE, to the exclusion of all others, because Student's needs are so complex.

(AR at 57-59 (BSEA Op. at 30-32)).

      D.B.'s parents timely filed a complaint in this Court seeking review of the BSEA hearing

officer's decision.  The Court will affirm the BSEA's decision that the February 2005 IEP

provided D.B. with a FAPE as required by the IDEA.

## III.   Standard of Review

### A.      The Summary Judgment Posture

"In a case like this, summary judgment is merely the device for deciding the issue, because the procedure is in substance an appeal from an administrative determination, not a summary judgment." *North Reading*, 480 F. Supp. 2d at 481 n.1 (citations and quotations omitted).

### B.      Deference and Involved Oversight

The Court's task in reviewing the decision of the hearing officer is carefully circumscribed by statute.

> Tracking the Act's two overriding concerns, the trial court's assessment of the IEP must address both procedural guarantees and substantive goals. The court must ask two questions: First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? . . . The ultimate question for a court under the Act is whether a proposed IEP is adequate and appropriate for a particular child at a given point in time.

*Roland M.*, 910 F.2d at 990 (internal quotations and citations omitted).

In conducting its review, the Court must be mindful of the deference owed to the decision below.

> Although the exact quantum of weight is subject to the district judge's exercise of informed discretion, the judge is not at liberty either to turn a blind eye to administrative findings or to discard them without sound reason. In the end, the judicial function at the trial-court level is one of involved oversight, and in the course of that oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale.

*Lenn*, 998 F.2d at 1087 (internal quotations and citations omitted).

In this type of case, the law demands that the district court: shall receive the

14

records of the administrative proceedings, shall hear additional evidence at the request of a party, and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate. 20 U.S.C. § 1415(e)(2). The court's principal function is one of involved oversight. The Act contemplates that the source of the evidence generally will be the administrative hearing record, with some supplementation at trial, and obligates the court of first resort to assess the merits and make an independent ruling based on the preponderance of the evidence. Nevertheless, the district court's task is something short of a complete de novo review.

[District courts] must, at one and the same time, be thorough yet deferential, recognizing the expertise of the administrative agency, considering the agency's findings carefully and endeavoring to respond to the hearing officer's resolution of each material issue. Jurists are not trained, practicing educators. Thus, the statutory scheme binds trial courts to give 'due weight' to the state agency's decision in order to prevent judges from imposing their view of preferable educational methods upon the States. Hence, the court must render what we have called a bounded, independent decision—bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court.

*Roland M.*, 910 F.2d at 989-90 (internal citations, quotations, and alterations omitted); *see also*

*Lenn*, 998 F.2d at 1086-87.

"[C]ourts should be [loath] to intrude very far into interstitial details or to become embroiled in captious disputes as to the precise efficacy of different instructional programs." *Roland M.*, 910 F.2d at 992. "The *Rowley* standard recognizes that courts are ill-equipped to second-guess reasonable choices that school districts have made among appropriate instructional methods." *Lt. T.B. v. Warwick Sch. Comm.*, 361 F.3d 80, 83 (1st Cir. 2004). "Judges are not trained pedagogues, and they must accord deference to the state agency's application of its specialized knowledge." *Lessard*, 518 F.3d at 24. In sum, it is the district court's job to render "an independent ruling as to the IEP's adequacy based on a preponderance of all the evidence, including the hearing officer's duly weighted findings." *Lenn*, 998 F.2d at 1089.

15

### C.      The Administrative Record

"[D]istrict courts frequently decide these cases without live testimony, on the basis of the administrative record."  *Roland M.*, 910 F.2d at 990.[7]  The administrative process is to be accorded "its due weight" such that "judicial review does not become a trial de novo, thereby rendering the administrative hearing nugatory."  *Id.* at 996.

> The district court reviews the administrative record, which may be supplemented by additional evidence from the parties, and makes an independent ruling based on the preponderance of the evidence.  That independence is tempered by the requirement that the court give 'due weight' to the hearing officer's findings.  This intermediate level of review reflects the concern that courts not substitute their own notions of educational policy for that of the state agency, which has greater expertise in the educational arena.

*Lt. T.B.*, 361 F.3d at 83-84.

### D.      Burden of Persuasion

In a case brought under the IDEA, "the burden of persuasion lies where it usually falls, upon the party seeking relief."  *Schaffer*, 546 U.S. at 58.  Although the posture in this case is somewhat complicated by the fact that Sutton (rather than the parents) first sought an administrative hearing, plaintiffs counterclaimed to challenge, among other things, the February 2005 IEP, a claim as to which they bore the burden of persuasion.  It is the review of that claim that occupies this Court and, as plaintiffs appear to concede, they retain the burden of persuasion here.

### IV.    The Adequacy of the February 2005 IEP

Through the complaint and their briefing, plaintiffs assert an extensive (and, in some cases,

---

[7] Neither party here has sought to introduce additional evidence to supplement the already-voluminous administrative record.

painstakingly detailed) litany of objections, criticisms, and challenges to the IEP, the IHO's conduct of the proceedings below, and the IHO's ultimate determination.[8]  The Court has reviewed and considered those objections in detail.  The Court, however, will not respond to each criticism or charge specifically.[9]  "In the last analysis, what matters is not whether the district judge makes a series of segregable findings, but whether the judge is cognizant of all the child's special needs and considers the IEP's offerings as a unitary whole, taking those special needs into proper account."  *Lenn*, 998 F.2d at 1090.

The Court has only a limited role.  *See S.M. v. Massachusetts Dept. of Ed.*, 07-cv-11440-NG, slip op. at 2 (D. Mass. Mar. 9, 2009) (referring to the "relatively narrow" scope of the district court's review).  The object of its review is to determine whether the proposed IEP was appropriate as a whole, based on a preponderance of the evidence.  As the First Circuit recently explained:

> The test is whether the IEP, taken in its entirety, is reasonably calculated to enable the particular child to garner educational benefits.  Were the law otherwise, parents could endlessly parse IEPs into highly particularized components and circumvent the general rule that parents cannot unilaterally dictate the content of their child's IEP.

*Lessard,* 518 F.3d at 30 (internal citations omitted).

---

[8] From all accounts, D.B. is an enthusiastic, endearing, cheerful boy.  His parents are to be commended for their zealous efforts in behalf of their son's education.  In particular, his mother has demonstrated almost superhuman resourcefulness in her development of an alternative placement for him.  Her love and devotion, and her unflagging commitment to his education, are evident from the record.

[9] Many of the criticisms are inconsequential.  (*See, e.g.*, Compl. ¶ 370 ("The failure of the IHO to consistently cite to the record in her opinion makes the process of evaluating her opinion confusing and difficult."); *id.* ¶ 371(c) (complaining that Dr. Chaskelson is not listed as a witness, as if the record did not also contain nearly one hundred pages of her testimony as a witness)).  To the extent the Court does not specifically address one of the points raised by plaintiffs, it is because the Court, in "measuring the adequacy and appropriateness of an IEP," has determined that these charges "lack . . . legal significance."  *Roland M.*, 910 F.2d at 990.

Furthermore, neither the IEP, nor the hearing officer's conclusion, need be perfect.  As noted, the IEP must be reasonably calculated to address D.B.'s education-related needs, and the hearing officer's assessment need only be supported by a preponderance of the evidence, not all of the evidence.  The requirement that the Court undertake "involved oversight" does not permit it to override the professional judgment of the Sutton schools simply because the IEP, or the IHO's assessment of the IEP, fell short of the ideal in some respect.

Finally, the Court notes that this is not a competition between the IEP prepared by Sutton and the independent program developed by the parents.[10]  In this regard, the Supreme Court has sent "a very clear message.  The short of it is that courts are entrusted with ascertaining the adequacy of an IEP's educational components but not with weighing the comparative merit of the components when stacked against other heuristic methods."  *Id.* at 29 (finding irrelevant parents' argument that student would have made more progress using the Lindamood-Bell system).  The IEP must be judged on its own merits; either it was reasonably calculated to confer educational benefit to D.B., or it was not.  The answer does not change depending on whether Lindamood-Bell or any other program might have also conferred educational benefit, or indeed *greater* educational benefit.  Thus, evidence that D.B. made progress in the private program does not necessarily speak to whether he also made progress, or could have, under the IEP.

That is not to say that all evidence concerning the private program is irrelevant.  The question of what constitutes meaningful progress for D.B. at Sutton is illuminated in part by evidence of the progress he was able to make elsewhere and is relevant to the broader but even

---

[10] When it first requested a hearing, Sutton sought a declaration that the parents' program deprived D.B. of a FAPE.  The IHO found that Sutton had not proved this claim.  Because defendants have not appealed from that portion of the IHO's decision, the Court need not consider it.

more perplexing question of his potential or capacity for learning.  In addition, the testimony of

plaintiffs' witnesses also occasionally exposes inconsistencies between the complaints plaintiffs

press against Sutton and the practices they have adopted through their new providers.[11]  Likewise,

consistencies in educational theories and approaches between plaintiffs' and Sutton's providers

vitiate some of plaintiffs' claims.

## A.   Alleged Procedural Inadequacies in the IEP Formulation

"The scope of a district court's inquiry into a state's compliance with the procedural

requirements of the federal Act encompasses not only the substance of special education, but also

the adequacy of the process through which a particular IEP has been created."  *Roland M.*, 910

F.2d at 994.  Plaintiffs contend that they were not afforded meaningful participation in the IEP

process in February 2005—notwithstanding the IHO's conclusion that they fully participated in,

and provided tremendous input into, developing and implementing Sutton's programs and

services, up to and including the final IEP.[12]  *Doe ex rel. Doe v. Defendant I*, 898 F.2d 1186,

---

[11] For example, plaintiffs question whether the reading teacher Sutton proposed to head the language-based classroom could effectively teach reading development, phonetic development, literacy associations, reading fluency and comprehension and development of math and writing skills, in part because it "would require someone who combined the skills and expertise of an OT, SLP, and educator in several disciplines who also specialized in dealing with severely apraxic children."  (Compl. ¶ 390).  Yet D.B.'s current tutor, Jennifer Yovino, apparently teaches D.B. math, history, science, technology, and English language arts, taking her material directly from the Frameworks of Massachusetts curriculum that would have been adapted for the Language Based Classroom.  Ms. Yovino had only had her Master's degree in special education for four months when she became D.B.'s tutor in September 2005 and was not yet fully licensed.  And her expertise in apraxia appears to have been based on the fact that she has read an article about the condition and a book by Shelley Velleman.  (AR at 1891).  The Court does not, of course, mean to suggest that Ms. Yovino is not capable of serving as D.B.'s tutor, but rather to highlight the inconsistency.

[12] Plaintiffs also raise objections to the June 2005 IEP and the IHO's discussion of that IEP.  As plaintiffs point out, the IHO's decision occasionally refers to "the IEP that Sutton offered in February 2005 (as amended in June 2005)."  (AR at 56 (BSEA Op. at 29)).  More frequently, the IHO refers to the two IEPs jointly, without distinguishing between them.

The June 2005 IEP was not properly at issue in the BSEA hearing and is not properly before the Court now.  The BSEA case was initiated by Sutton in March 2005 to obtain a declaration that the *February 2005* IEP

1191 (6th Cir. 1990) ("Adequate parental involvement and participation in formulating an

IEP . . . appear to be the [Supreme] Court's primary concern in requiring that procedures be

strictly followed."). Plaintiffs also assert that, contrary to the IHO's findings, they were

consistently denied meaningful participation in formulating the IEP. (Comal. ¶ 365, 373).[13]

D.B.'s father has alleged that he observed "[j]ust an unwillingness to discuss these

elements that we felt were crucial to the program with Sutton. Just a kind of take it or leave it,

this is our IEP approach, which we didn't feel was beneficial to or appropriate to [D.B.]'s

educational well-being." (AR at 2038).[14] But the fact that a school district did not accept all of a

parents' suggestions cannot constitute a *per se* violation of the IDEA. Were this the case, it

would "circumvent the general rule that parents cannot unilaterally dictate the content of their

child's IEP." *Lessard*, 518 F.3d at 30. Strictness in scrutinizing IEP procedures

> must be tempered by considerations of fairness and practicality: procedural flaws
> do not automatically render an IEP legally defective. Before an IEP is set aside,
> there must be some rational basis to believe that procedural inadequacies
> compromised the pupil's right to an appropriate education, seriously hampered the
> parents' opportunity to participate in the formulation process, or caused a
> deprivation of educational benefits.

*Roland M.*, 910 F.2d at 994. Thus, absent a more concrete procedural violation, such as

constructive exclusion from the process, the Court's focus reverts to the content of the IEP itself,

---

provided D.B. with a FAPE. The parents' counterclaims also concerned only the February 2005 IEP. The claims were never amended. In any event, the IHO did not rely on any feature unique to the June IEP in rendering her determination. Indeed, from the record, it appears that there is no meaningful difference between the two.

[13] Among other things, the parents contend that the school was not receptive to the information that they provided (for example, about the efficacy of Lindamood-Bell and the inappropriateness of the Wilson Reading Program) and was consistently dismissive of their concerns and suggestions. (AR at 2037, 2323-31).

[14] On cross-examination, counsel for Sutton established that D.B.'s father lacked documentation as to some of these issues. Sutton's ability to respond to these concerns is limited when they were not presented in writing. In some cases, documentation supporting the parents' removal of D.B. was first provided to Sutton only after D.B. had already been removed. (AR at 2066-67).

as first assessed by the IHO.

**B.     Alleged Procedural Inadequacy at the BSEA Hearing**

Plaintiffs contend that the IHO erroneously considered D.B.'s entire history in Sutton. They contend that the issue before her was whether the February 2005 IEP proposed by Sutton would provide D.B. with a FAPE, and that consideration of D.B.'s history in Sutton was irrelevant to that determination, because the IEP should have been considered independently and in isolation as a stand-alone document.  (Comal. ¶¶ 353, 431).  This contention is without merit.

First, much of this history is useful, if not necessary, as background information to provide context to frame the question presented.  Indeed, it is difficult to imagine how the IHO could even understand the issues without a significant amount of background.

Second, past performance is a relevant (although hardly foolproof) predictor of future performance.  Thus, for example, if the question is whether provision of certain services to D.B. was likely to confer some educational benefit, it is useful to know whether the provision of similar services conferred any educational benefit in the past.  A student's history of success or failure in a given placement is obviously relevant for predicting the likely effectiveness of continuing that placement.  "Actual educational progress can (and sometimes will) demonstrate that an IEP provides a FAPE."  *Lessard*, 518 F.3d at 29.   Indeed, plaintiffs recognize this, or they would not complain about "the appalling and chaotic approach of Sutton's Team in providing services to D.B." and "the inconsistent and/or lack of progress made by D.B."  (Comal. ¶ 366).

Third, plaintiffs themselves refer to the same history—at least when it supports their position.  In fact, plaintiffs' counsel at the BSEA hearing explicitly asked the IHO to consider D.B.'s historical progress at Sutton.  In seeking admission of testimony by Dr. Velleman about

the appropriateness of prior IEPs, counsel for plaintiffs explained that "the progress that he was making, what type of progress, which is really the crux of the issue as far as being removed from the school." (AR at 1417).[15]

The Court finds no error. While the goal, both here and below, is to determine whether the February 2005 IEP would provide D.B. with a FAPE going forward, consideration of his history was appropriate at the hearing and is appropriate here.

### C.      Alleged Substantive Inadequacies

In the interests of efficiency, both the substance of the IEP, and the IHO's handling of the parents' numerous substantive attacks on the IEP, will be discussed at the same time. There are three overarching issues that will be addressed first: (1) the problems associated with gauging D.B.'s progress in light of his potential or capabilities; (2) plaintiffs' challenge to the IHO's credibility determinations and the weight she attributed to their expert testimony; and (3) the difficulty of fact-finding and reconciling inconsistencies on the current record.

### 1.      Gauging Progress in Light of D.B.'s Potential or Capabilities

Although plaintiffs level many criticisms, the most significant issue is undoubtedly the question of D.B.'s progress under the Sutton IEPs. As to that issue, plaintiffs have raised two principal objections: first, that the IHO failed to determine D.B.'s potential or capability; and, second, that Sutton was not educating D.B. to his potential and therefore was "satisfied with the minimal gains that he made." (Pl. Mem. at 12).

### a.      D.B.'s Potential or Capabilities

---

[15] As the IHO observed: "I think what we are trying to get at is how it is that this student has or had not made progress. How that is measured and what is being proposed in terms of what is appropriate for him. It is appropriate to look at what has taken place in the past in order to do that." (AR at 1418).

The extent to which D.B. is capable of achieving success at learning is a central focus of this dispute.  The IHO found that his "baseline cognitive abilities are the subject of debate and have been difficult to assess because of his communication disorders and difficulty with attention." (AR at 33 (BSEA Op. at 6)).  Plaintiffs complain that the IHO failed to make a determination of D.B.'s potential, which they contend is necessary as a basis against which to measure her conclusion that DB's progress was "meaningful."  (Comal.¶ 420 (quoting BSEA Op. at 30 (AR at 57)); *see also* Comal. ¶ 437).[16]  On the facts of this case, and as demonstrated by the testimony of plaintiffs' own experts, that is not a fair criticism.

Assessing D.B.'s capabilities presents a significant, perhaps impossible, challenge.  In October 2004, Ms. Carley's partner at Project Child, Diane Levinson, reported that D.B. "was unable to participate in standardized testing due to his severe dyspraxia."  (AR at 2267).  Dr. Chaskelson testified that testing D.B. in normal ways for apraxia was difficult because he was not sufficiently developed.  (AR at 1949).  While Dr. Chaskelson reported that she "got a sense of a working diagnosis and a working profile" for D.B., she admitted that under "circumstances where we don't have tools that are perfectly geared to someone like [D.B.]," she could not say that she "know[s] exactly everything about him."  (AR at 1952).  Her report is only a working model, and will need to be updated as they learn more about him.  (AR at 1953).  Dr. Velleman reported that even nonverbal IQ tests will underestimate the cognitive potential of apraxic students.  (AR at

---

[16] There is no merit to plaintiffs' allegation that without assessing D.B.'s potential "there is no basis to determine if Sutton's program complied with state and federal law that would let D.B. reach his 'full educational potential.'"  (Compl. ¶ 420).  Plaintiffs misstate the applicable legal standard.  The benefit conferred by the IEP "need not reach the highest attainable level or even the level needed to maximize the child's potential."  *Lenn*, 998 F.2d at 1086; *see also North Reading*, 480 F. Supp. 2d at 488 ("Massachusetts law requires only that a child be provided with a 'free and appropriate education,' rather than 'the maximum possible development.'") (internal quotations and citations omitted).

1445).[17]

The staff at Lindamood-Bell encountered similar difficulties.  They used a thumbs-up, thumbs-down system at first to see if D.B. was tracking the instructors and understanding their questions.  (AR at 1753).  Tara Reynolds further explained:  "[W]hen we first met [D.B.], even in doing some testing with him and screening him, it was very difficult to gauge, and it still is, to gauge his potential in terms of his language skills. . . .  It was very hard to test [D.B.]."  (AR at 1739, 1744).

Practically speaking, to know D.B.'s capabilities, it is first necessary to know how much he understands.  Thus, the question of his potential is bound up in his receptive language comprehension, which is significantly impaired.  As Dr. Velleman explained, "Apraxia, per se, does not imply that the child will have receptive language issues.  In fact, one of the criterion features of apraxia is that receptive language must be better than expressive language.  But, as in the case of [D.B.], receptive language is better than expressive language, but it also is affected."  (AR at 1482).  Dr. Chaskelson explained the issue as follows:  "[I]f he knows something and he can't say it, that doesn't mean he doesn't know what.  How do we know he knows it?  That's what is always very hard.  We have to find ways to figure out what he knows and what he doesn't know and what his conceptualization is."  (AR at 1955).  Dr. Andra C. Munger of the Cognitive Development Center of Lexington evaluated D.B. in September 2005.  She noted that "[w]hile [D.B.]'s cognitive abilities are underdeveloped, he problem-solves and follows directions at a higher level than his use of language would otherwise indicate."  (AR at 2410).

---

[17] All of D.B.'s scores on the Verbal Motor Production Assessment for Children that Dr. Velleman administered in November 2005 "were below the 5th percentile for his age (and mostly, below the 5th percentile for three-year-olds)."  (AR at 2422).  At the time, D.B. was nine years old.

Ms. Dooley-Smith made a similar observation: *"There seems to be a large discrepancy in regards to how to accurately view [D.B.]'s cognitive skills."* (AR at 2272 (emphasis in original)). "[C]ognitive/linguistic abilities go hand in hand and therefore, recommendations for language progression may be difficult to suggest given that [D.B.]'s cognitive levels are not accurately known at this point in time." (AR at 2275).[18]

Notably, Dr. Sexton's October 2002 report did not conclude that D.B. is mentally retarded. She reported that his "overall scores" fell within "the borderline to the mild category of mental retardation." In other tests, Dr. Sexton noted that his dyspraxia compromised his performance, but that she attempted to compensate by crediting gestures and signs for some verbal items. (AR at 4284). She concluded that D.B.'s "diagnosis of dyspraxia is accompanied by global developmental delays to a sufficient extent that at this point he also meets service requirements under the federal category of intellectual impairment." (AR at 4285).

Dr. Sexton's report is consistent with Dr. Chaskelson's findings in some key respects. Dr. Sexton was clear that although she used a standard intelligence test, she knew that any results would be impacted by his developmental delays and cautioned that "it is critical that those using this evaluation be clear that the current scores should not be interpreted as limiting views of his overall potential or his ability to learn." (AR at 4282). Thus, Dr. Sexton was herself sensitive to the danger of confusing D.B.'s current performance with his potential. She sympathized with D.B.'s parents' concerns in that respect. "On a day-to-day basis, his family might be concerned

---

[18] Ms. Dooley-Smith was agnostic at best about D.B.'s potential, noting in her summary that his "speech and language issues . . . may be strongly related to decreased cognitive abilities." (AR at 2292). She recommended more testing along a data-driven approach, conceding that "given his significant verbal difficulties, an accurate assessment may be unable to be achieved within quantitative testing." (AR at 2292).

that school personnel, thinking in terms of a diagnosis of intellectual impairment, might limit their expectations for his potential achievements.  However, clinicians and current assessments indicate that [D.B.] is capable of making surprising gains." (AR at 4286).  Dr. Sexton considered the real utility of her evaluation to be the establishment of a baseline for future assessments.  Thus, she recommended reassessment of his cognitive skills as he developed.

Dr. Amy Morgan examined D.B. on March 11, 2005, after his parents had already removed him from Sutton.  (AR at 4615).  Dr. Morgan reported that his "[o]verall cognitive abilities ranged from an approximate 2- to 3-year age level and adaptive skills were generally commensurate with cognitive abilities.  In light of [D.B.]'s difficulties, the test results can be considered an accurate reflection of his current functioning although they may not accurately represent his cognitive potential." (AR at 4619).  Her assessment did not change materially based on her reevaluation in June 2005.  She noted apparent progress since March, but concluded that his "performance on structured tasks has remained essentially unchanged over the past 3 months; his cognitive abilities remain within an approximate 2- to 3-year age range with adaptive living skills generally commensurate with his cognitive abilities." (AR at 4624).

In the final analysis, D.B.'s "potential" simply cannot be ascertained with any substantial degree of confidence.  According to Dr. Chaskelson, the tasks administered by Dr. Morgan in March and June 2005 "provided evidence to support an understanding of cognitive functions but did not provide a valid and reliable standardized measure of his overall intellectual abilities or general cognitive ability for the purpose of estimating his intellectual capacity, based on professional standards." (AR at 2471).  His limitations confounded the results of the tasks.  (AR at 2472).  Dr. Chaskelson's own tests were modified extensively and did not yield standardized

scores.  (AR at 2476).  She ultimately reported that "[a]lthough a definitive conclusion regarding his overall cognitive abilities cannot easily be generated, there is no evidence that warrants a determination that his intellectual ability is limited."  (AR at 2479).[19]  She reported bright spots and encouraging signs, but also marked inconsistency, and noted that his apraxia and sensory integration impeded performance.  Thus, even though Dr. Chaskelson did not believe that he was necessarily limited intellectually, she could not say so definitively.  At the hearing, she testified as follows:  "I don't feel there is any reason to assume that his general intellectual capabilities, capacity for thinking is below average.  That that is an assumption that one would have to make. *You can't assess it.  We don't have tools that can assess that.*"  (AR at 1953 (emphasis added)).  In terms of his cognitive abilities, Dr. Chaskelson did not want to say that D.B. is mentally retarded or suffering from a global developmental delay, but she was forced to admit that she could not properly make those assessments.  (AR at 1954-55).

Furthermore, and despite plaintiffs' characterization of the evidence, Dr. Chaskelson did not, in fact, testify that "D.B. was a child of at least average intelligence."  (Comal. ¶ 437; *see also* Pl. Mem. at 12).  In substance, she said she could not be sure one way or the other.  Even her report, as quoted by plaintiffs, only stated that "there is no evidence that warrants a determination that [D.B.'s] intellectual capacity is limited."  (Pl. Mem at 13 n.6).  Dr. Velleman,

---

[19] It is not clear how this conclusion (and her subsequent testimony consistent with it) are to be reconciled with the seemingly contradictory statement in her report that "a review of factors within the *best performance* criteria supports an estimate that overall intellectual abilities should be considered to approximate age level expectations."  (AR at 2479 (italics in original)).  This would apparently relate to her observation that "his scatter indicates age level functioning in some skills, *requiring* that age level potential be recognized."  (AR at 2495).  While Dr. Chaskelson had observed that D.B.'s functioning in some areas, particularly personal domestic living skills (AR at 2475), was "limited to age-appropriate," on a purely intuitive level it would hardly seem to follow that he has age-level potential across all areas.  In the end, however, even if that potential must be recognized, it does not materially assist the Court in its analysis, as she clarifies that D.B. nonetheless "should not be expected to apply his cognitive abilities at a level consistent with his peers."  (AR at 2489).

who had quoted Dr. Chaskelson's assessment, conceded that it is actually beyond her expertise to assess a child's cognitive status.  (AR at 1446).[20]

The IHO thus correctly concluded that D.B.'s baseline cognitive abilities were "the subject of debate" and "difficult to assess."  Indeed, one cannot conclude that D.B. is in fact cognitively impaired—only that there is insufficient evidence to make that determination.  As a consequence, it is difficult to take account of his potential or capacity in any analysis of whether his progress demonstrates educational benefit.  Moreover, even if it were conclusively established that he did not have cognitive impairments, the pervasive impact of his disabilities on his academic advancement would continue to make accurate estimations of appropriate progress problematic at best.

### b.    Meaningful Progress for D.B.

Similarly, determining what constitutes "meaningful" progress for a child with D.B.'s disabilities is very difficult.  The nature of his disability is such that any progress will be frustratingly slow and highly susceptible to regression and setbacks.  And the concept of "progress" in this context is highly relative; D.B.'s progress cannot be measured against other children his age or against children suffering from different disabilities.[21]

However, whatever actual level of progress D.B. may have been making at Sutton, plaintiffs contend that it was insufficient.  Parents cannot be faulted for wanting the best for their

---

[20] Dr. Velleman stated that she quoted Dr. Chaskelson because "the general public and even respected professionals who don't happen to be speech language pathologists will often judge a person's cognitive potential based upon their speech.  It is very easy to assume that a child who has limited speech also has limited cognition." (AR at 1445).

[21] His father acknowledged the problem:  "One thing you have to realize with [D.B.] is because of the degree of his challenges, progress and improvement are all relative."  (AR at 2028).

children, including seeking to maximize their potential.  Unfortunately, that is not what the statute requires.  *Cf. S.M. v. Mass. Dept. Of Ed.*, 07-cv-11440-NG, slip op. at 17 (D. Mass. Mar. 9, 2009) ("At bottom, this lawsuit centers around S.M.'s parents' unilateral decision to send their daughter to [a private program].  As parents, they can hardly be faulted for this choice.  But the School District's obligations under the IDEA are not judged by the same yardstick.").  The question is whether D.B. was making meaningful progress, and thus deriving educational benefit, at Sutton.

Plaintiffs appear to concede that D.B. was making at least some progress.  D.B.'s father testified that "[e]ven though he was making minimal progress, he wasn't making the progress that he should have been making."  (AR at 2029).  The Court agrees with the IHO that this progress, even if less than optimal, was likely to continue under the new IEP and would have been sufficient to satisfy the IDEA.  As the First Circuit has noted, "an inquiring court ought not to condemn [an accepted educational] methodology ex post merely because the disabled child's progress does not meet the parents' or the educators' expectations."  *Lessard*, 518 F.3d at 29.

According to the evidence, educational progress is often an elusive target for apraxic children.  Dr. Velleman, an expert hired by plaintiffs, testified that progress in apraxic children can be illusory.  She reported that her protégés are often frustrated by the lack of progress of their apraxic students:  "They get frustrated, because the children with apraxia 'don't make progress.'" (AR at 1357).  In fact, Dr. Velleman noted that a student's lack of progress was historically a key indication that he or she suffered from apraxia.  (AR at 1358).

Dr. Velleman's testimony also sheds light on the D.B.'s apparent regression after his summer program with Lindamood-Bell.  Plaintiffs contend that the IHO disregarded or

29

discredited evidence of D.B.'s regression, while fully accepting Sutton's evidence and testimony of D.B.'s progress.  (Comal. ¶ 352).  It appears, however, the IHO agreed with Dr. Velleman that regression is an inescapable part of the process and not necessarily indicative of the inadequacy of the IEP.  Dr. Velleman testified that when a student moves on to a new goal, he risks losing mastery of the previous objective.  Variation of goal and context must be done systematically and in small steps.  (AR at 1359).  "[T]hings like fatigue, distractions, noise, whatever, can also throw a wrench into the works.  So, one also has to be prepared to go back a step.  Kids who have mastered a skill can be thrown off."  (AR at 1359).  Elsewhere, Dr. Velleman has written that "[l]ack of intervention for several weeks during the summer would no doubt result in a very significant regression of skills."  (AR at 2427).  Thus, D.B.'s apparent regression is consistent with Dr. Velleman's understanding of the challenges facing apraxic students:  "[T]here is regression on something that had previously been apparently mastered."  (AR at 1360).[22]  While he made progress in many areas, the modification to the Worcester State treatment plan reported that D.B.'s production of one-word signs and ability to follow one-step directions actually decreased in the first few months he was there after leaving Sutton.  (AR at 2356).

D.B.'s progress at Sutton was documented in multiple progress reports, IEPs, and interim evaluations.[23]  (*See generally* AR at Volume VII).  That progress was also acknowledged and

---

[22] The testimony concerning D.B.'s overall progress is often at odds with specific contemporaneous progress reports.  (*Compare* AR at 2361 (reporting on April 11, 2005 that D.B. "[h]as made great progress in both the 'Talkies' program and the LiPS/Seeing Stars programs"), *with* AR at 2403 (reporting on July 20, 2005 that D.B. "continues to make slow progress in both the Seeing Stars, LiPS, and Talkies programs"), AR at 2411 (reporting on October 7, 2005 that D.B. "continues to make slow progress with the Seeing Stars/LiPS programs"), *and* AR at 1812 (where Tara Reynolds conceded that D.B.'s progress at Lindamood-Bell has been "very slow")).  Those apparent contradictions illustrate the uneven nature of his progress.

[23] Dr. Sexton was "very impressed with the extent and intensity of supportive educational services that [D.B.] is already receiving through the Sutton Public Schools, and it is difficult for me to find additional services to

documented by the parents and various observers.  For example, in May 2001, D.B.'s neurologist, Dr. Holmes, wrote that he was "in an ideal classroom with excellent one on one support.  His progress this year has been great." (AR at 2141).  In December 2001, Ms. Buxton noted that "[D.B.]'s abilities reflect a positive learning environment in which he has been provided with the supports necessary to maximize his success."  (AR at 2152).  In December 2003, Dr. Holmes wrote the following:

> Since my last visit with [D.B.], he has continued to make nice progress from a developmental standpoint.  Speech has improved dramatically with an increased vocabulary.  He is beginning to express himself much better.  He is able to follow multi-step commands. . . .   I am please[d] with how [D.B.] is doing from . . . a developmental standpoint.

(AR at 4400).

The claim that D.B. made no meaningful progress while at Sutton is at odds with multiple contemporaneous impressions in the record.  Dr. Sexton reported that D.B.'s mother said that he "made significant progress during the last year" leading to "a difference like 'night and day' between his development skills roughly nine months ago and currently."  (AR at 4280).  In July 2004, D.B.'s father e-mailed Kirsten Esposito, Sutton's Director of Special Education, noting that "[t]hings seem[] to be going well this year."  (AR at 2243).  In February 2004, D.B.'s father wrote:  "I have never questioned the quality of services [D.B.] receives at Sutton, or the commitment to [D.B.]'s interests by all involved in providing those services, which I deem to be of the highest caliber."  He also acknowledged that while D.B. needs additional services to achieve progress in accessing the general curriculum, he was "making solid and exciting progress

---

recommend, as his current services are so comprehensive. . . .  *In all honesty, I cannot think of other services to recommend, as [D.B.]'s I.E.P. is among the most comprehensive that I have ever seen (and I believe that I have read a couple thousand educational plans over the years)*."  (AR at 4286 (emphasis added)).

in some areas." (AR at 4444). As the parents' former education advocate observed: "I'm impressed by both the complexity of [D.B.'s] profile and the array of services his Team has determined to be essential to providing [a] FAPE." (AR at 4500).

More recent providers also noted progress. Ms. Kulcsar reported that since she began working with him in 2002, D.B. "has demonstrated marked improvements in many . . . target areas. His success is likely due to many factors. These include maturity, and a strong desire to interact with others in combination with frequent, intense one-to-one speech and language therapy and participation in the social interaction with his classroom and social circle." (AR at 4449).

The IHO credited the testimony of Sutton witnesses concerning D.B.'s progress under the IEPs. Ms. Oleksyk testified at some length about the progress made by D.B. while under her instruction from 2002 through 2005:

> In terms of attention, he went from fleeting attention to approximately five minutes with maximum prompts to easily a 30-minute session was minimal prompts. He was able to pronounce all of the short and long vowels and a couple of what we call dipthongs like OW. He was able to use words spontaneously and some of those words were two-word phrases. Not only did he reciprocate a greeting, he initiated a greeting. His play skills were significantly improved. When I met David, he would play by putting things on top of his head watching them fall. He would also throw things. He couldn't blow bubbles because his breath support wasn't there. . . . Then he was able to play with blocks without knocking down the other people's blocks inappropriately. He would wait and then knock them down when he was supposed to. But, most impressively in the play was that in my room, he was able to and in other rooms too, play with the foam bowling ball set. He took turns when he played. His speech heightened. He was even able to put the bowling pins down because I used something called visual mapping. There are little circles on the floor. So, he could pick the bowling pin up and place them on. So, his play skills improved and his spontaneous speech heightened during that time.

> He was also using carrier phrases, he was able to use three and beginning to use four-word utterances. But, that was not strictly spontaneous speech. That was with carrier phrases or sign language to prompt him to speak. Movement is very

important in an apraxic child.

(AR at 867-869). Tracy Kolofsky, a first-grade teacher at Sutton who is licensed in general and special education, testified that he had made progress since she last saw him in June 2003 and that he continued to make progress throughout the 2004-2005 academic year. (AR at 1223). She testified that he was accessing the first-grade curriculum as modified for his needs. (AR at 1226). Ms. Kolofsky testified that, with modification, he participated in all areas that were provided in the regular first grade curriculum. (AR at 1234). Still, Ms. Okelksyk admitted that measuring gains is complicated with a child such as D.B. (AR at 892).

D.B. apparently also made great strides in his occupational therapy sessions with Cynthia Beaudin. Ms. Beaudin testified that he had increased postural control, which "is the foundation for being able to do things more skilled with your hands." (AR at 1039). She noted improvements as well in his attention levels, his controlled hand skills, cutting, coloring, and his overall interest in wanting to do the work. She explained: "Before coloring was like, no. Now actually, seeing peers do it, getting out a crayon on his own and following along with what they were doing. So, that was one of the biggest and most exciting ones was the desire to be able to do that." (AR at 1039).

The testimony of plaintiffs' witnesses who sought to discredit evidence of D.B.'s progress at Sutton appears to discount or ignore the baseline difficulties of apraxic students. Thus, for example, Dr. Velleman sought to document D.B.'s lack of progress by comparing disparate documents. If he could make a sound in one report that was not noted in another subsequent report, Dr. Velleman concluded that this reflected a lack of progress, despite the fact that she herself testified that apraxic children can be frustratingly inconsistent when it comes to making

progress.[24]  Her own evaluation came nearly a year after D.B. left Sutton, meaning that what he

could and could not do at that point may well have been substantially influenced by Lindamood-

Bell and the possible disruption to his progress likely caused by the shift in the provision of his

educational services.  More fundamentally, D.B.'s performance is inconsistent.  This was reflected

in the February 2005 IEP:  "[D.B.]'s participation, attention, and comprehension of activities and

tasks are inconsistent and vary from day to day, at this point."  (AR at 15).  As his current

occupational therapist, Kathy Carley, observed, "sometimes he would be able to process what was

coming in and other times he would get a very blank look and not be able to process."  (AR at

1638).  Dr. Chaskelson noted that "inconsistencies persist, with many variables directly attributed

to features of the environment, task, and/or format of presentation."  (AR at 2465).[25]

     Nor—despite plaintiffs' characterization—are Dr. Morgan's reports directly to the

contrary.  Dr. Morgan expressed concern as to "the lack of measurable progress over the past

---

[24] (*See* AR at 1434 ("This raises two concerns in my mind.  One, that a sound that he got a great deal of work on, S, he does not seem to have made any progress on.  And two, that the documentation is questionable in terms of an IEP from 1/04 stating that he has a certain skill and then that skill not being in evidence in school documents or in my own evaluation two years later.")).

[25] In particular, reports concerning D.B.'s mean length of utterance and his verbal expressive communication were inconsistent, with the inconsistencies across providers and time periods too numerous to detail.  There appears to be a pattern where a teacher or therapist, regardless of when he or she first encounters D.B., notes that he is using only one-word phrases and then reports remarkable progress throughout their sessions as he begins using two- and three-word phrases, even if at least some use of two-word phrases had already been documented prior to their first session.  (*See, e.g.*, AR at 2549 (reporting that in her sessions with D.B. since September 2005, "[h]is language skills have gone from one to two/three word phrases")).

     Dr. Chaskelson's report illustrated the inconsistency in D.B.'s receptive communication:  "He mastered *rectangle* and *oval* but did not designate *square*.  Analysis of the protocols for the very same test administered previously revealed that in 5/04, he did not master *square*, with the others not given, due to an early ceiling reached, while in 6/05, he mastered *square* and *oval* but did not designate *rectangle*.  In addition, in psychological testing in 3/05 and 6/05, he was administered a different test of receptive vocabulary, and in 3/05 he mastered *circle*, *oval* and *round*, but in 6/05 he mastered *circle* and *oval* but not *round*."  (AR at 2485; *see also* AR at 4222 ("Because [of his] variability with his accuracy day to day, the validity of baseline data was in question."); AR at 4228 ("[A]ccuracy with these [reasoning tasks] on a given day varied drastically.")).  Some of this inconsistency, of course, may be attributable to differences in testing conditions.

three years since [D.B.]'s psychological evaluation of 2002."  (AR at 4624).  The direct measure

of progress to which she was referring was improvement in the kind of tests that she and Dr.

Sexton administer, with the 2002 test administered by Dr. Sexton serving as the baseline.  In the

immediately preceding sentence, however, she referred to progress that would manifest as

improved performance on other standardized tests.  Plaintiffs complain that the IHO

"inexplicably" noted that Dr. Morgan "did not state the basis for concluding that there had been

no progress or the areas where there was no progress."  (Comal. ¶ 395 (quoting AR at 50); *see*

*also* ¶ 394).  But there was extensive evidence that D.B. made progress in occupational therapy,

receptive language, and even speech that was well-documented by Sutton.  It is not clear on what

basis Dr. Morgan could reasonably conclude that D.B. had made no progress at all in his

development since 2002.  Even parents have conceded that he had made some progress by then,

even if not up to their expectations.[26]

---

[26] Although D.B.'s success after his removal from Sutton is not strictly relevant to an evaluation of the
February 2005 IEP—which, after all, is a "snapshot" of D.B.'s abilities and goals, *see Roland M.*, 910 F.2d at
992—it is worth noting that his post-Sutton progress has not been as consistent as plaintiffs seem to contend.
Despite spending approximately a year and a half in the Lindamood-Bell program—a program that plaintiffs'
witnesses all contend is the best fit for D.B.—by some accounts he had hardly progressed at all.  A witness from
Lindamood-Bell, Tara Reynolds, conceded that D.B.'s progress has been "very slow."  (AR at 1812).  She stated:
"I am familiar with . . . the fact that [D.B.] has had a very difficult time.  We have been unable to do many
measures with him."  (AR at 1790).  Ms. Reynolds conceded that his independent verbalizing between October
2005 and June 2006 had not improved much.  (AR at 1811).  As of October 2006, at the age of ten, he still could
not read.  (AR at 1812).  Ms. Reynolds stated that any progress that he had made at Lindamood-Bell "may not
show up on standardized testing."  (AR at 1790).  As of the date of the hearing, D.B. was scoring a zero on
phonemic awareness, the skill on which Lindamood-Bell's LiPS program is focused.  (AR at 1788-89).  The
struggles and setbacks at Lindamood-Bell starkly demonstrate the severity of his disability and the consequent
difficulties faced by his educators.  They are objective indications of his limitations, even in a highly
individualized, one-on-one setting.

What progress D.B. has made has been irregular and requires frequent goal adjustment.  As Ms. Reynolds
explained:  "We have to constantly re-evaluate.  So, we may have at times started some of those tasks with VV
[visualizing and verbalizing] and then taken them off for a break for several weeks and then gone back to them."
(AR at 1768).  The Lindamood-Bell staff encountered similar difficulties trying to teach him spatial concepts.
They have been working on stabilizing his spatial concepts on and off since he first came to Lindamood-Bell in the
summer of 2004.  (AR at 1814).  Some spatial concepts may have stabilized by March 2006, but he was still

In sum, as Dr. Chaskelson observed, "it's really hard to say what [D.B.] is actually doing and what he is getting out of it." (AR at 1981). That simple statement has profound implications for the task of evaluating whether D.B. receives some educational benefit from a particular educational program. The fact that his progress was irregular, and that various objectives were not met and had to be changed, is not a fair basis for criticizing the Sutton IEP. Thus, while it may be difficult to reconcile all of the testimony and all of the written evidence, there is no definitive assessment as to what progress he has actually made or what progress would be meaningful. Without any clear evidence that D.B. had the potential to progress more rapidly, the Court cannot conclude that Sutton's program was not likely to provide the meaningful progress that is the hallmark of educational benefit under the statute. In light of this fact—and given the Court's lack of relevant expertise, the deference due the IHO's decision, and the evidence that the team members at Sutton were endeavoring in good faith to devise and implement a highly individualized IEP with services that addressed his various disabilities and had obtained at least some progress in the past—the Court will uphold the IHO's determination that the February 2005 IEP was sufficient to provide meaningful educational progress.

## 2.      Credibility Determinations and the Weight of the Expert Testimony

Plaintiffs contend that the IHO both unduly credited the testimony of Sutton's witnesses and unfairly disregarded that of their own witnesses. They allege that the "IHO gave undue deference to the testimony of Sutton's witnesses to the near exclusion of any consideration of the

---

working on others. D.B.'s progress on LiPS, for which spatial concepts were something of a prerequisite, also appeared stalled. (AR at 1768-69). When the Lindamood-Bell staff finally resumed LiPS in mid-August of 2006, they "had to reintroduce a lot of the beginning LiPS tasks." (AR at 1769, 1772). In a progress report prepared after June 24, 2005, the staff cautioned that "[a]lthough it is likely that sensory-cognitive stimulation will result in further progress, due to the present low level of [D.B.]'s scores, prognosis for attaining age level appropriate performance is necessarily guarded." (AR at 2459).

testimony of Parents or Parents' witnesses, including such testimony that DB's progress was minimal, inconsistent and, therefore, not meaningful." (Comal. ¶ 350).[27]  They further contend that the Team members from Sutton who testified "possessed only rudimentary, if any, knowledge of apraxia and how to provide services to treat it." (Comal. ¶ 360).  Furthermore, plaintiffs characterize the testimony of the Sutton defendants as "unfounded, unrealistic, rank self-serving speculation" that "shows how complete Sutton's lack of understanding of apraxia is, and is belied by the testimony of Parents' witnesses with their extensive backgrounds in apraxia, as well as the documentary evidence." (Comal. ¶ 422).  Plaintiffs stress that their witnesses were experts in their respective fields.  They contend that Sutton did not produce a neuropsychologist to testify about D.B.'s learning profile and capacity for learning, nor did they produce any witness who was as knowledgeable about apraxia as their experts. (Comal. ¶ 354).

The Court discerns no error in the IHO's findings.  Credibility determinations are best left to the judgment of the tribunal hearing the evidence in the first instance.  *See North Reading*, 480 F. Supp. 2d at 490 ("Given that this is a fact-intensive inquiry that relies on credibility determinations (which the hearing officer, with both expertise and contemporaneous perspective, is in a better position than I to make), there is no reason to disturb the hearing officer's conclusion [concerning] an appropriate placement."); *see also Sch. Bd. of Indep. Sch. Dist. No. 11 v. Renollett*, 440 F.3d 1007, 1010-11 (8th Cir. 2006) ("The district court must give 'due weight' because the administrative panel had an opportunity to observe the demeanor of the witnesses and

---

[27] Plaintiffs correctly note that the IHO mistakenly referred described Elaine Valk as a "certified speech/language pathologist" (AR at 12) when, in fact, Valk is a speech assistant who is supervised by a speech language pathologist, and erroneously referred to Terry Dooley-Smith as "Dr.", when, in fact, she does not have a doctoral degree.  The extent, if any, to which this affected the IHO's weighing of the evidence is unclear; nonetheless, the errors are not sufficient to tip the balance in favor of reversing the IHO's decision.

because the court should  not substitute its own educational policy for those of the school authorities that they review.") (quoting *CJN v. Minneapolis Pub. Schs.*, 323 F.3d 630, 636 (8th Cir. 2003)).

Moreover, plaintiffs' attempt to frame this as a competition between the credentials and expertise of the various witnesses is misleading.  That is not the nature of the inquiry here.  The only question is whether D.B. was likely to receive educational benefit from the IEP.  The qualifications of the Sutton witnesses need only be sufficient for the IHO to be able to give reasonable credit to their testimony.  Because of their training and experience and their perspective from continued contact with D.B., Sutton's witnesses were competent to testify about their observations of his past progress and their opinions on the likelihood that he would continue to derive educational benefit from his time at Sutton.

Plaintiffs' witnesses were less qualified to speak directly to the February 2005 IEP and the services Sutton had been providing.[28]  Although they may be experts in their fields, parents' witnesses never actually observed D.B. at Sutton.  Consequently, much of their testimony concerning the February IEP is itself speculative.  This is not to minimize the expertise of parents'

_____

[28] While the same may arguably fairly be said of Sutton's witnesses' opinions about parents' private placement, the adequacy of that plan is not presently before the Court, and therefore those opinions are not relevant.  In addition, plaintiffs have suggested that defendants blocked their experts from observing the proposed program at Sutton.  (Compl. ¶¶ 410, 432; Pl. Mem. at 17-19).  It appears that this was because parents failed to act through counsel to request access and the school district was responding in the manner of adversarial parties in litigation. (*See, e.g.*, AR at 2558 (April 2006 letter from Dr. Chaskelson to Director Esposito seeking D.B.'s schedule under the proposed IEP); AR at 2582 (May 2006 letter from Attorney Tate:  "The parents have been adamant that any observation of [D.B.] in his current program had to be done and arranged through the attorneys.  Therefore, since Mr. Heffernan has never requested that come observe the program, Sutton will not comply with your request.")).  More importantly, as Ms. Tate also noted in her May 2006 letter, even if parents' experts had had access, they would not have observed D.B. in the program.  Because the IEP was individualized for him, the fact that he never enrolled under that IEP made it literally impossible for Sutton to demonstrate what D.B.'s program would have looked like.  The other students proposed for the language-based classroom had different profiles and so their programs would not necessarily accurately reflect the modifications that would have been "aligned" to D.B.'s needs.

witnesses; it is simply to note that their expertise does not automatically trump anything the Sutton witnesses might have to say about their own program and D.B.'s response to it.[29]

### a.      The Sutton Witnesses

In any event, the IHO's credibility findings have substantial support in the record. Certainly, as plaintiffs contend, some of the testimony of Sutton witnesses was self-serving.[30] That is to be expected and is unavoidable, just as some of the testimony of plaintiffs' witnesses was also self-serving.  Nor is the existence of occasional evidentiary conflict sufficient to change the overall balance of the evidence which demonstrates that the February 2005 IEP was reasonably calculated to confer an educational benefit.

The testimony of Jane Oleksyk was particularly noteworthy.  Ms. Oleksyk has been a speech/language pathologist at Sutton Public Schools since 1978.  She is licensed in elementary education and speech pathology and has taken professional development courses and workshops in apraxia starting in 1999.  In January 2005, Ms. Oleksyk completed a two-day workshop with Dr. Velleman.  While at least some of her apraxia training took place after D.B. left Sutton, it was completed before she testified.  (AR at 895).  Ms. Oleksyk was thoroughly familiar with D.B., devoting a 30-minute session to him every day, five days a week.  (AR at 845).  Her sessions reflected a flexible approach, combining programs, including Easy Does It Apraxia, and changing tack as necessary, for instance when she decided that the Kaufman program was less useful. (AR

---

[29] It also appears that their expertise may have obscured the true objective, as most of their disagreements with the February 2005 IEP were more about optimization than the adequacy needed to satisfy the IDEA.

[30] Of course, not all of Sutton's witnesses were convincing on every point for which they provided testimony.  For example, the testimony of Elaine Valk, a speech/language pathology assistant at Sutton, often conflicted with progress reports and the testimony of other Sutton witnesses and appeared poorly supported.

at 853-55).

Ms. Oleksyk comes across as knowledgeable and credible, reporting modest but significant progress—qualifying or clarifying the details where necessary to give a more complete picture—and acknowledging areas where progress had stalled.  Ms. Oleksyk testified that when she first began working with him, D.B. was unable to follow two-step instructions, but that by the time he left, he could, on occasion, follow two-step directions. (AR at 847-48).  At the same time, she acknowledged that while he made some improvement in the skills that would be necessary to use it, the DynaMyte was too advanced for D.B. to use as intended—that is, as his voice.  (AR at 858).

Cynthia Beaudin first evaluated D.B. when he was three years old.  (AR at 1004).  A licensed occupational therapist in Massachusetts, Ms. Beaudin has been providing occupational therapy to Sutton students since August 1999.  Ms. Beaudin and D.B. worked on sensory integration, starting with two 30-minute sessions per week and increasing to three 30-minute sessions per week.  She also provided (and updated as necessary) a sensory diet for D.B.'s use at home and at school.  She stressed the importance of maintaining consistency in the provision of occupational therapy.  She testified that she and D.B. had worked together so consistently that she said he "knew exactly what to expect just by facial expression or what he needed to do.  I think that being well aware of what capabilities are and how much to push was important as well." (AR at 1040-41).

Gina DeCaro is a special education teacher at Sutton.  She has a master's degree in education with a focus on special education and she is certified and licensed in Massachusetts for special education and is awaiting documentation of her elementary education certification.  Ms.

DeCaro saw D.B. for 60 minutes per day in kindergarten and first grade, broken into two 30-minute sessions.  DeCaro had the opportunity to observe D.B. in both the one-on-one setting and in a small group.  She testified that she, too, believed that D.B. would make progress under the 2005 IEP.  (AR at 1126).

Tracy Kolofsky teaches first grade at Sutton.  She is licensed in general and special education.  She has her initial certification in early childhood education and is in the process of applying for a reading certification.  Ms. Kolofsky was formerly a special education teacher at Sutton, at which time she had at least some involvement with D.B.  Ms. Kolofsky had no doubt that D.B. would continue to make progress.  (AR at 1233).

Some of Sutton's witnesses had substantial experience with apraxia.  Ellen Honeyman has bachelor's and master's degrees in communication disorders.  She is a licensed speech language pathologist in Massachusetts and served as a speech/language pathologist in Springfield for several years.  Ms. Honeyman is an educational consultant, providing training and consultation to Massachusetts school districts.  During her time as a consultant, she also served as interim director of special education in Lexington.  She is an adjunct faculty member at Framingham State College in the fields of special education, literacy, and instructional technology.  She has previously served as the director of special education for the Worcester and the Springfield public schools.  In her career, Ms. Honeyman estimates that she has probably worked with at least two or three dozen students with apraxia.  (AR at 1276).  In fact, she was involved in the development of a language-based program for students with apraxia in pre-kindergarten, kindergarten, and first grade.  (AR at 1276).

While Ms. Honeyman had no direct experience with D.B. and had never observed Sutton's language-based classroom, her opinions should be at least as helpful in assessing the adequacy of the February 2005 IEP from a theoretical standpoint as those of plaintiffs' witnesses. After reviewing numerous reports (including neuropsychology evaluations by Dr. Morgan and Dr. Sexton, Ms. Dooley-Smith's report, the OTA evaluation, and teacher assessments), Ms. Honeyman endorsed the Sutton IEP.  (AR at 1283).  She stated:  "It was my opinion that based on the evaluations that I had read, the teacher assessment of '04, and the IEP, that the program as proposed by Sutton . . . contained the elements of a very robust language-based program.  Also, one of the things that I certainly was looking for in reading the report and then I found evidence of was an integrated approach among the educators and the related service providers."  (AR at 1284).[31]  The IEP was similar to the apraxia program that Ms. Honeyman had helped to develop in Springfield, in that it involved a coordinated approach of occupational therapy, speech/language therapy, and some exposure to the regular education classroom.  (AR at 1279).  She testified that it has not been her experience, nor does she believe, that there is anything about apraxia that would preclude an apraxic student from having his or needs met in a public school.  (AR at 1279).

### b.    The Parents' Witnesses

The IHO's decision to discredit certain aspects of plaintiffs' witnesses' testimony concerning the February IEP is also supported by the record.  For example, Dr. Velleman is not certified to teach in Massachusetts.  She has never been a school staff member.  (AR at 1472).

---

[31] In context, it appears that Ms. Honeyman is referring to the June 2005 IEP.  As noted above, the June 2005 IEP is, in substance, identical to the February 2005 IEP.

She was not familiar with the challenges of educating D.B. in particular.  She never spoke with Sutton personnel about their work with D.B., and never observed him in his regular education classroom or in his special education pull-out sessions.  (AR at 1440-41).  The extent of her knowledge of his time at Sutton appears to come from her review of some therapy and classroom notes.  (AR at 1441).  In fact, Dr. Velleman has had little exposure to even the parents' program.  She has only ever seen videos of D.B. at Lindamood-Bell and she has never observed him with his current speech/language pathologist (Jasmine Urquhart), his tutors (Jennifer Yovino or Susan Rosie), at Project Child, or at the Beverly School for the Deaf.  (AR at 1451, 1470).

Likewise, Ms. Urquhart has never spoken to anyone at Sutton about D.B.'s progress there or observed him at Sutton in class (regular or special education) or therapy (speech language or occupational).  (AR at 1562-63).  She never spoke with Ms. Kulscar, D.B.'s outside speech language pathologist, while he was at Sutton.  (AR at 1564).  Similarly, occupational therapist Kathy Carley never observed D.B. in his Sutton therapy sessions and never spoke with Ms. Beaudin, D.B.'s occupational therapist at Sutton.  (AR at 1689-90).[32]  Moreover, while she oversees his care, Ms. Carley is not the direct provider for D.B. at Project Child.  (AR at 1688).  And although she has strong opinions about the propriety of placing D.B. in a language-based classroom, Dr. Chaskelson has never actually seen D.B. in a classroom.  (AR at 1971).

Plaintiffs complain that the IHO did not cite the testimony of Naomi Chedd, an expert in assessing the educational, social, and emotional needs of children with learning disabilities and neurological impairments.  (Pl. Mem. at 5-6).  Obviously, it would have been preferable for the

---

[32] This remains true even though, as plaintiffs point out, "[Ms.] Carley began seeing D.B. in the winter of 2004 for auditory processing therapy [when she was in a position to] observe [D.B.] while he was still attending school in Sutton."  (Comal. ¶ 371(f)).

IHO to state specific findings as to her testimony.  But Ms. Chedd's personal experience with

D.B. was limited, and she appeared less than fully informed about his case in particular.[33]  She

never observed D.B. at Sutton and never did any formal testing with him.  (AR at 1855, 1868).

Important aspects of her testimony were derivative of the work of others.  She acknowledged that

the statement in her report that D.B. had made little progress at Sutton was derived "mostly by

other people's reports"—reports she received from D.B.'s parents and the "clinicians that they

had hired"—and that her opinion in that regard is not based on her own personal knowledge.

(AR at 1869).

Not all of parents' witnesses were overly critical of the February 2005 IEP.  From her

testimony, it appeared that Ms. Urquhart agreed with the speech goals:  "[T]hose do seem to be

the syllable structure, the phono-tactic type of goals do seem to be in line with the type of work

that he would need to be doing."  (AR at 1553).

Furthermore, some of the criticisms leveled at the IEP appear to be inconsistent.  Ms.

Urquhart's criticism of the IEP focuses not on its goals or methodologies so much as the

performance-level narrative, particularly that the MLU might be based on structured or modeled

speech, as opposed to spontaneous speech, and should have been expressed as an exact

calculation.  (AR at 1553-54).  Ms. Carley's criticism of the IEP was that while the goals are

correct, D.B. had already been working on them for several years.  (AR at 1667).  Yet Ms. Carley

testified earlier that there is no "instant cure" for children with dyspraxia, that their education is a

"process" that "continue[s] for a very long time."  (AR at 1664).  She explained that,

---

[33] For example, despite the dispute surrounding D.B. as a total communicator, Ms. Chedd did not recall ever reading anything about D.B. and a total communication approach.  (AR at 1869-70).

unfortunately, there are some "dyspraxic children that will never draw a face. They don't have that internal organization of themselves." (AR at 1667-68). Dr. Velleman's testimony suffers from the same weakness. Seemingly ignoring the inevitability of regression and setbacks, Velleman testified that "if effective progress is being made, goals at a later date would not recapitulate progress that supposedly had been made earlier." (AR at 1471).

Plaintiffs' witnesses were also prone to speculative and tendentious testimony. For example, Ms. Chedd testified that the Lindamood-Bell program "seems to be working for [D.B.]" after she had just testified that he was doing the same drills one year later and all that had improved is his response time. (AR at 1856-57). Even though her opinion was admittedly "based on mostly other people's reports," (AR at 1857), she noted that D.B. "hadn't had much success as far as I could tell before that." (AR at 1857). The basis for this conclusion is never made clear, especially considering that she rejected records of progress from Sutton as not credible without the benefit of competing contemporaneous evidence: "I said I have trouble believing that he could say 40 words unless there was a major regression and that's possible." (AR at 1860).

In short, the credibility determinations of the IHO were amply supported by the evidence, and this Court sees no reason to disturb those findings on the present record.

### 3.  Fact-Finding and Reconciling Inconsistencies

The third problem that implicates virtually all of IHO's fact-finding is the question of consistency. The testimony of the many witnesses was inconsistent when it came to D.B.'s abilities and progress as well as acceptable methodologies for his instruction. As discussed above, the evaluations and recommendations from various experts were also inconsistent.

This complication was at its most notable when it came to reports of D.B.'s progress.

For example, although multiple people were tracking it, few agreed on D.B.'s mean length of utterance at any time. (*See, e.g.*, Comal. ¶ 381 (criticizing the IHO for accepting Sutton's findings in the February 2005 IEP that D.B. had made recent gains in verbalizing, used one-word phrases consistently, some two- or four-word phrases with cues)). Because of the risk of regression upon his removal from Sutton, it is difficult to evaluate claims that observations of D.B.'s service providers post-removal conflict with Sutton's documentation of D.B. abilities. (*See, e.g.*, Comal. ¶ 383 ("Urquhart's testimony contradicted DB's alleged progress set out in the IEP, but the IHO did not comment on this contradiction.")).

In light of this conflicting evidence, the IHO was forced to chart her own course through the record. Because this task involves credibility determinations and her conclusions find ample support in the record, the Court will defer to the IHO's findings.

### 4.      Substance of the IEP

The Court has considered plaintiffs' substantive criticisms of the IEP in some detail. Most notably, it has considered the objections concerning (1) the viability of Sutton's reading program, (2) the alleged vagueness of the February 2005 IEP, (3) the development of so-called "splinter skills," (4) the use of the DynaMyte device, (5) the recommendations concerning a "total communication" approach, and (6) whether Sutton was adequately accommodating D.B.'s specific needs in occupational therapy and speech/language pathology. As to each of those criticisms, the Court has concluded that they are without merit, that the IHO's decision is reasonably supported by the evidence, or both. There are two interrelated issues, however, that merit separate discussion: the extent to which D.B. required one-on-one instruction and D.B.'s need to develop socialization skills.

46

a.       **The Need for One-on-One Instruction**

The February 2005 IEP called for D.B. to receive some therapies exclusively one-on-one, while also facilitating social interaction in a group setting with the assistance of his one-on-one aide.  Plaintiffs allege that the IHO disregarded D.B.'s need for exclusive one-on-one instruction, notwithstanding the testimony of Dr. Velleman and Dr. Chaskelson that such instruction was required.  There substantial is evidence in the record, however, that D.B. did not require one-on-one instruction exclusively and that he flourished in some group settings.  And even D.B. made more rapid progress with one-on-one instruction in all areas, that would not dispose of the issue.  Again, "[a]n IEP need only supply some educational benefit, not an optimal or an ideal level of educational benefit, in order to survive judicial scrutiny."  *Lessard*, 518 F.3d at 23-24 (internal quotation omitted).

There is no question that one-on-one instruction would be helpful to D.B. (as, indeed, it would for virtually any student).  Dr. Velleman correctly noted D.B.'s problems focusing and the accommodations he required for content, context, pacing, stimuli, and multiple repetitions, all of which benefit from having one-on-one instruction.  (AR at 1398).  Her conclusion was as follows:

> I believe that for some period of time, and my guess would be a minimum of one year, he will continue to need to get . . . all academics that involve linguistic processing . . . in a one-on-one situation, in a setting with a professional where there are minimal distractions.  And the professional can dedicate 100% of her or his time to accommodating [D.B.] in terms of content, pacing, level of stimulation, amount of stimulation, number of cues, types of cues, and so forth.  I believe that socialization is important for children, but at this point [D.B.] is not able to benefit from socialization and academics at the same time.  And that socialization needs to be addressed in a very explicit way with [D.B.] being trained one-on-one with an adult, with specific social skills, and then help to generalize perhaps to one-on-two and then slightly larger groups those skills as they are trained.

(AR at 1434-35; *see also* AR at 2427).

But there was also substantial evidence that D.B.'s academic progress would benefit from a group placement. Dr. Morgan recommended that he "be placed in a small classroom setting with a highly structured education program and a 1:1 aide. Daily tutorials, preferably with the 1:1 aide . . . and well structured inclusion activities for development of social interaction skills are strongly recommended." (AR at 4619). The proposed language-based classroom would have substantially conformed with this recommendation. Similarly, in 2001, Ms. Buxton wrote that she "highly support[ed D.B.]'s involvement in regular classroom activities/specials and interactions with his peers." (AR at 2155). Ms. Oleksyk explained that the language-based classroom would be appropriate for D.B., even though it was not purely one-on-one instruction. Ms. Oleksyk felt he was ready for small groups in some areas, such as rhyming words and word families and reading; among other things, he could potentially benefit from hearing other children rhyming, modeling the skill for him. (AR at 970-71).[34]

There appear to be three main concerns regarding D.B.'s placement in a group setting: his need for individualized attention at all times, his need for highly individualized instruction, and his problems with attention and focus.

The first issue is that D.B. needs constant individualized attention. It does not appear that

---

[34] Ms. Oleksyk's testimony in this regard is supported by Ms. Urquhart, who wrote in her July 2005 planning note that D.B.'s "ability to imitate will be very instrumental in further expanding his expressive skills." (AR at 2408). Ms. Buxton had previously recommended that the team "[f]ocus on the use of peers as models in activities in which [D.B.] can be successful." (AR at 2155).

there is much dispute as to this point.[35]  Accordingly, the February 2005 IEP specifically stated: "[D.B.] requires a one to one to appropriately integrate his various needs."  (AR at 8).  Indeed, virtually all of D.B.'s instruction and therapy at Sutton under the February 2005 IEP was going to continue to be provided one-on-one, either as direct one-on-one instruction or with the services of a one-on-one aide.  (AR at 19, 2461).  Ms. Oleksyk testified that the language-based classroom provided for one-on-one attention from his teacher or his aide if necessary, as well as group instruction or sub-group instruction.  (AR at 876).[36]

The second concern is that instruction in group settings would not be sufficiently tailored to D.B.'s specific needs and abilities.  While there were clear benefits to highly individualized one-on-one instruction, the evidence also showed that there were potential educational benefits to be realized from group settings.  For example, Ms. DeCaro testified that D.B. appeared to be learning and modeling from other students in his small group.  (AR at 1189).  She added that one-to-one lessons were not working as well because D.B. would get fatigued and was not making much progress.  (AR at 1189-90).  According to Ms. DeCaro, in their sessions under the previous IEP, D.B. fit in with her group of students who "were working on very basic skills, pre-reading, pre-math, things like that."  (AR at 1087).  She believed that more integration into the regular classroom would have been beneficial.  (AR at 1105).

The third concern is that D.B. would be too distracted by the presence of other children in

_____

[35] Ms. Valk testified that "[i]n order to make progress with severe apraxia, you need an intensive one-to-one program in apraxia."  (AR at 851).

[36] Ms. Urquhart appears to have been experimenting with something similar in his private placement. While she believes that D.B. needs one-on-one instruction for speech and language (citing his distractibility, sensory integration, and sensory processing), she said that "it would be appropriate for him to be in a group and I have tried to pair him in a group with another child, in still one-on-one situation.  So, there are two clinicians to work on the social communication piece with another child."  (AR at 1541).

the room.  There is an apparent conflict in the evidence between generalized evidence about the

dangers of distraction posed by a group setting and more specific evidence concerning D.B.'s

actual experience.[37]  Because parents' witnesses had never really observed D.B. in a group

setting, much of their testimony was somewhat speculative and appeared to conflict with his

actual experience at Sutton.  Ms. Chedd testified that while she normally does not recommend

one-on-one programs, she believed that one-on-one instruction was appropriate for D.B. because

he still lacked the basic skills—such as the ones he was working on at Lindamood-Bell—to take

advantage of a group situation.  "Not that he never will, but he kind of needed a very strong basis

to begin with."  (AR at 1842-43).  Ms. Chedd was also afraid that an unsuccessful attempt at

social integration could prove harmful:  "I wouldn't want to see a kid like him fail because he is

fragile.  He hasn't had [a lot] of social successes. . . .  I really want to set him up to succeed

before going into a situation like that."  (AR at 1844).[38]  While that concern is legitimate, there

was, in fact, evidence that D.B. has had successful social interactions.  D.B. had already been

surrounded by children for years at Sutton and, by all accounts, had become more socialized, not

---

[37] Plaintiffs allege that the IHO's rejection of Dr. Chaskelson's testimony on this issue was "based on her own opinion and not on the basis of any evidence directly before her."  (Compl. ¶ 409).  But Dr. Chaskelson testified that the Lindamood-Bell staff had noticed that D.B. "liked to be with other kids" and that "[t]hey felt it was positive for him."  (AR at 2006).  Thus, now at Lindamood-Bell, "[t]here is actually another child in the room at the same time working in a different lesson.  I didn't see that [D.B.] was distracted by that.  That really struck me, because I thought he would have been."  (AR at 2006).  Dr. Chaskelson ultimately confirmed what the Sutton witnesses observed—that D.B. likes and does well around other children.  She conceded, "At first I was concerned.  But, it seemed to be working."  (AR at 2007).

[38] Ms. Chedd conceded that, even now, D.B. "certainly should have ability and access to other children. . . . I'm not saying he wouldn't learn anything, but I think that he would only get a percentage of it.  And I would want to see him get more in a situation, in a teaching situation."  (AR at 1844-45).  Her desire for D.B. to get the most from a teaching situation, while understandable, is not the question before the Court.

50

less, as a result of that integration.[39]

The language-based classroom was intended to work much like the regular education classroom in which D.B. had sometimes received lessons in first grade.  In light of the fact that he would have his own one-to-one aide, it is far from clear that he would not reap educational benefit from being grouped in the same language-based classroom.[40]  D.B. benefitted from his activities in the regular first grade classroom, despite the fact that his learning profile was vastly different from the rest of the class.[41]

Finally, it should be noted that a reduced reliance on a one-on-one setting corresponds with the IDEA's "least restrictive environment" requirement.  *See, e.g.*, *Lenn*, 998 F.2d at 1086 (noting the IDEA's "preference for mainstreaming").  "The goal . . . is to find the least restrictive educational environment that will accommodate the child's legitimate needs."  *C.G.*, 513 F.3d at 285.  In D.B.'s case, the benefit of the "least restrictive environment" approach was supported by

---

[39] Ms. Yovino echoed Ms. Chedd's concerns, testifying that "it would be very difficult for him right now to be able to be in a small learning group and actually feel good about that."  (AR at 1901).  She said that he "feels" that the other children are making fun of him.  (AR at 1901).  But Ms. Yovino only works with D.B. in isolated, distraction-free rooms at the public library.  Ms. Yovino's testimony was not based on her observations of D.B. in a classroom, but her observations of him "over time and what he is capable to do in a one-on-one session" and her "experience in a regular education classroom and what typically takes place [there]."  (AR at 1918).  She never actually observed D.B. in a regular classroom.  (AR at 1918).  Furthermore, she based her conclusion that D.B.'s sensory issues would interfere with his ability to learn in a regular education classroom on the reports provided by the parents, despite also reviewing reports from Sutton that said D.B. was able to stay on task in a regular classroom.  (AR at 1919).

[40] Ms. Dooley-Smith observed that D.B. "is able to participate in a structured classroom setting with adult supports" and dismissed concerns that he would be distracted by the "open classroom" aspect of the setting.  (AR at 2274).  She said the while he is "very much in control and clearly knows the rules of the classroom," D.B. "is much more animated in a 1:1 or small group setting."  (AR at 2287).  The language-based classroom would have been a small group setting.

[41] Even legitimate pacing concerns appear to reflect an unduly narrow focus.  Dr. Velleman said that D.B.'s pace would likely be uneven, even as compared to other learning disabled students.  (AR at 1398-1400).  But non-learning disabled students in regular education classes presumably learn at different paces from their classmates and attain varying degrees of mastery.  And those children lack the benefit of a one-on-one aide reviewing an individualized modification of the lesson with them.

the evidence, and the Court sees no reason to disturb the finding of the IHO in that respect.

**b.     D.B.'s Socialization and Interactions with Other Children**

Plaintiffs contend that at Sutton D.B. "was not learning skills that would lead him to . . . meaningful socialization." (Pl. Mem. at 26). Ms. Dooley-Smith's evaluation cast serious doubts about his ability to socialize meaningfully at Sutton. She wrote: "[D.B.] likes to be around other children but has a great deal of difficulty engaging them. He was noted to stay by himself a lot and although he interacted with adults, even within [these] interactions the adults took the lead . . . ." (AR at 2287). His inability to access and perform social commenting and inability to effectively utilize the DynaMyte led to D.B. "[b]eing alone a great deal of his day or being engaged with adults, who are facilitating his communication." (AR at 2287). She also stated that D.B. "seemed overall somewhat disinterested in the children around him." (AR at 2273). At recess, his "interactions with peers were felt to be much more typical of a younger child. He engaged in many chasing games and simple give and takes. He gravitated to the girls who did at times 'mother' him often guiding his answers and level of participation." (AR at 2274).

It is obvious that a child with D.B.'s communication and motor difficulties will have considerable problems interacting with other children.[42] Dr. Chaskelson's observation that "especially as he gets older and the other kids are less patient with someone like [D.B.], it is very difficult for him to have a meaningful interaction with another child" appears correct. (AR at

---

[42] Ms. Chedd testified in general terms that "a lot of people make that mistake by thinking these children are happy just being around other kids. Well, that's not the case. You have to be able to have some kind of meaningful participation with other children in order to have a successful experience. A lot of kids without communication skills that allow them to interact with other kids don't have a great deal of success." (AR at 1878).

1967).[43]

There was, however, substantial evidence that D.B. was learning socialization skills at Sutton. In December 2001, Ms. Buxton noted that he "[d]isplayed empathy for a peer who was crying, used appropriate eye contact during communicative interactions unless he was distracted, and has established friendships with peers. In addition, [D.B.] experiences pleasure from interactions with his peers and family. He desires to communicate with others and will engage in pretend play with his peers, staff, family, and independently." (AR at 2151-52). Ms. Buxton also wrote that D.B. "is interested in others and wants to be an active participant in social interactions." (AR at 2152). Ms. Urquhart noted that D.B. "exhibits strong interest in interacting with other children in the office." (AR at 2407).[44] At Project Child, D.B. "loves when other children are in the clinic. If another child was available he would do more active play or sometimes just observe." (AR at 2297). Ms. Oleksyk testified that D.B. was motivated by other students and children. He "smiled and laughed and his spontaneous speech increased at that time." (AR at 870). Ms. Valk said that he "was happiest around people" and that he "was at the point where he needed to carry over a lot of the skills that he had at that moment with his friends." (AR at 818).[45]

---

[43] This concern was reinforced by Ms. Oleksyk's testimony on an unrelated point: "Sometimes their gap between their peers, the child and the peers, is not that big when they're young. As they get older, the gap increases." (AR at 915). Even according to the IEP, D.B. typically only engages in parallel play. (AR at 1179).

[44] Ms. Urquhart remarked on D.B.'s desire to be with other children after he left Sutton: "He is very social in the sense that I see him really wanting to communicate with other kids. Initially, he wasn't spontaneously using greetings with other children. You'd see him in the waiting room, he'd kind of stand near them or stand by his mom, but be watching and observing them. Over the course of his treatment, we've worked on having him use more spontaneous greetings to say hi to other kids." (AR at 1559-60).

[45] The extent to which D.B. had been accepted as a member of the class was also reflected in the reactions of his classmates after his removal. Ms. Kolofsky testified that when D.B. left in March 2005, the other students

Even his occupational therapy apparently benefitted from increased interaction with other students.  Ms. Beaudin also testified that one of the reasons she started doing one therapy session per week in the classroom was, in addition to generalizing skills, that D.B. "did seem to really benefit from peers, peer interaction, watching peers, picking up what they were doing, following cues from them."  (AR at 1016-17).  In her words:

> I believe that he could respond well and be more motivated to work on handwriting and drawing in the classroom setting when everyone else was doing it. It was a more natural setting for him.  The expectation was there for everyone to be doing it.  And he was doing it to the best of his ability.  He would get a cue to get a certain color crayon.  And I really believe that the increased interest in coloring and writing came in when he was in the classroom more, because it was kind of what everybody else was doing.

(AR at 1066).

Ms. Dooley-Smith remarked that "when he was provided with the opportunity to work in a small group or within circle time where he was able to engage with other peers, he benefitted tremendously from those interactions."  (AR at 2276).  She supported small group settings for language work:  "I do not believe that [D.B.] easily has the skills to access new concepts and language tasks through regular education setting [but his] participation in a 1:1 session does not do very much to expand his overall language and social abilities.  He is very much more motivated to talk in a small group situation.  I would encourage the team to consider having peers participate in some of these language sessions."  (AR at 2293).  She had observed that "[o]f particular note[] is the fact that the other children became much more engaged with [D.B.] when [his communication book] was present. . . . [I]mmediately several children came over to [D.B.]

---

had "a lot of questions.  Where is he?  They had concerns.  Is he coming back?  Where is he?  Is he at home learning?  Is he at school?  Does he have friends?  Is he coming back was their big, big question."  (AR at 1240).

and were pointing to the coins [involved in the math lesson], asking him questions and giving him hints as to things he might consider raising his hand to answer for."  (AR at 2274).[46]

There was also evidence that D.B.'s increased immersion in the regular education classroom was helping him make sense of his world.  (AR at 17).  Ms. Valk noted that he increasingly commented on the things around him and in his environment in his last year at Sutton. (AR at 814).  Ms. Beaudin testified that

> he was growing in terms of his ability to know what was appropriate. . . .  He was becoming more aware of other students, what other students were doing. Somebody had noted before that he used to knock over towers and blocks and get other children a little upset.  He was becoming more appropriate with that.  He was learning that that was not what you did.  He was benefiting from the structure and the routine and gaining independence to his ability.

(AR at 1067).  Ms. DeCaro agreed that some of his purported distraction might actually be D.B. taking in the world around him, taking in information to regulate himself and have his world make sense to him.  (AR at 1193-93).

The Sutton witnesses also disputed Ms. Dooley-Smith's observations about D.B.'s level of peer interaction.  Ms. Oleksyk testified that it was not her experience that D.B. spent most of his day with adults, isolated from other children.  (AR at 870-71).  He was with other children when they did "hands-on activities."  (AR at 871).  By March 2004, he was having snacks with his class and was included in some whole-group instruction.  (AR at 1033).  Ms. Kolofsky testified that the observations in Ms. Dooley-Smith's report concerning D.B.'s inability to engage with other children were true in October 2004, but had changed over time.  (AR at 1245-46).  By

---

[46] Dr. Chaskelson stated, however, that D.B.'s "emerging social interaction skills . . . are best fostered with an adult."  (AR at 2493).  She did not feel he was ready for direct peer interaction in a social situation.  "He needs to develop a level of mastery for a task of interest to others before he can offer something to another child." (AR at 2494).

March 2005, he was able to name a majority of the class by name (by use of word approximation) and could greet them and say "hello." (AR at 1246).[47]

The February 2005 IEP envisioned increased contact with non-disabled students in the general education classroom. Ms. Esposito stated that "his general [education] classroom, which has the 20 students give or take, that would be his classroom for circle time, specials, morning greeting, snack, because he had friends in that classroom that gravitated towards him on a daily basis." (AR at 723). Such partial-inclusion programming furthers the statute's goal of educating disabled children in the least restrictive environment.

In light of the evidence of its positive effect on D.B., and the IDEA's preference for a less-restrictive learning environment, the Court concludes that D.B.'s increased involvement in group education under the February 2005 IEP was appropriate and that the plan appropriately provided for the development of meaningful social skills.

\* \* \*

In summary, the Court is satisfied that the February 2005 IEP complied with the IDEA and that the decision of the IHO should not be overturned. Accordingly, partial summary judgment in favor of the defendants is appropriate.

**V.**   **Conclusion**

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment and Plaintiff's

---

[47] Apparently, at least some of the conflict between Ms. Dooley-Smith's report and the Sutton witnesses' testimony can be explained by progress D.B. had made prior to his removal from Sutton but subsequent to Ms. Dooley-Smith's report. Ms. Kolofsky explained the evolution of D.B.'s peer interaction in 2004-2005 school year: "As the year progressed, [he] really became part of the class . . . and class community. He was more a member of the class . . . when he was more involved. When we started doing his academics more in the class, I think the children thought of him as being more of a classmate . . . ." (AR at 1227-28).

Supplemental Motion for Summary Judgment are DENIED.  The Cross-Motion of Defendant

Massachusetts Department of Elementary and Secondary Education for Partial Summary

Judgment and the Cross-Motion of Defendants Kirsten Esposito, Cecilia DiBella, the Sutton

School District, and the Sutton School Committee for Partial Summary Judgment are

GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  September 30, 2009