# United States Court of Appeals
## For the First Circuit

---

No. 10-2184

D.B., a minor, by his next friend and mother Elizabeth B.;
ELIZABETH B.; DAVID B.,

Plaintiffs, Appellants,

v.

KIRSTEN ESPOSITO, both individually and in her role as former
Director of Special Education for the Sutton School District,
f/k/a Kirsten Brunsell; CECILIA DiBELLA, both individually and in
her role as Superintendent of Schools for the Sutton School
District; SUTTON SCHOOL DISTRICT; SUTTON SCHOOL COMMITTEE;
MASSACHUSETTS DEPARTMENT OF EDUCATION,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor IV, U.S. District Judge]

---

Before

Lynch, Chief Judge,
Lipez and Thompson, Circuit Judges.

---

David R. Bohanan for appellant.
David S. Lawless and Regina Williams Tate, with whom Nancy
Frankel Pelletier, Robinson Donovan, P.C., and Murphy, Hesse,
Toomey & Lehane, LLP were on brief, for appellees Kirsten Esposito,
Cecilia DiBella, Sutton School District, and Sutton School
Committee.
Julie B. Goldman, Assistant Attorney General, with whom Martha
Coakley, Attorney General, was on brief, for appellee Massachusetts
Department of Education.

March 23, 2012

**LIPEZ, Circuit Judge**. This case requires us to examine the rights of a disabled child under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1491, and to assess whether the child and his parents have raised triable discrimination or retaliation claims under other provisions of federal law.

D.B. is a disabled child who lives with his parents in Sutton, Massachusetts. From 1999 until 2005, D.B. was a student in the Sutton public school system, which each year developed an individualized education program ("IEP") for him, as required by the IDEA. In 2005, dissatisfied with the services D.B. was receiving and, in particular, with D.B.'s 2005 IEP, D.B.'s parents removed him from the Sutton school system and enrolled him in a private learning center. In response, the Sutton school system sought a determination from an independent hearing officer ("IHO") of the Massachusetts Bureau of Special Education Appeals ("BSEA") that D.B.'s 2005 IEP complied with the IDEA. D.B. and his parents sought the opposite determination, as well as reimbursement for the costs of D.B.'s private education.

After the IHO ruled for the Sutton school system, D.B. and his parents sought judicial review of the IHO's decision by filing a lawsuit in Massachusetts state court, which was later removed to the United States District Court for the District of

Massachusetts.  The district court upheld the IHO's decision in a summary judgment ruling.  This timely appeal followed.

D.B. and his parents argue that the district court erred by affirming the ruling of the IHO that she could determine the compliance of D.B.'s 2005 IEP with the IDEA without first determining D.B.'s potential for learning and self-sufficiency. They also argue that they raised triable claims under the First Amendment, the Rehabilitation Act of 1973 ("Rehabilitation Act"), Titles II and V of the Americans with Disabilities Act ("ADA"), and 42 U.S.C. §§ 1983 and 1985.  Appellees are the Sutton School District; the Sutton School Committee; Cecilia DiBella, the Sutton Superintendent of Schools; Kirsten Esposito, the former Sutton Director of Special Education; and the Massachusetts Department of Education.

Finding no error in the district court's entry of summary judgment against appellants, we affirm.

## I.

### A.  Factual Background

D.B. was born in September 1996 and now is fifteen years old.  As a result of violent seizures during his infancy, D.B. has experienced significant developmental delays.  He has been diagnosed with verbal apraxia, which is a motor speech disorder, and with dysarthria, which is a weakening of the speech-producing muscles.  There is no dispute that D.B. is disabled and that his

disability affects not only his speech but also his expressive and receptive communication, reading, focus, and overall cognition.

D.B. began receiving specialized services to address his disability during his infancy. These services continued after he entered the Sutton public school system in the fall of 1999, at which time he received his first annual IEP - a written document describing his development and laying out goals and services for him. Although D.B. was then three years old, his cognitive skills were equivalent to those of a twelve- to eighteen-month-old. He followed simple one-step directions and could imitate certain sounds, but he was essentially nonverbal and had difficulty sorting items. Despite making some developmental progress during the 1999-2000 school year, he remained nonverbal.

During the summer of 2000, D.B.'s parents enrolled him in an intensive, supplemental speech and language program. Encouraged by D.B.'s progress in the supplemental program, his parents pressed the Sutton school system to incorporate additional services into D.B.'s curriculum. As a result, during the 2000-2001 school year, D.B.'s speech therapy sessions became more frequent, he received a one-on-one aide, and he was introduced to sign language and the augmentative Picture Exchange Communication System ("PECS"). D.B. learned to produce ten consonant sounds and some word approximations, sign and gesture with some effectiveness, and use

the PECS to convey basic messages.  Overall, his communication, motor skills, and social skills improved measurably.

During the 2001-2002 school year, D.B. was placed in a preschool classroom with fourteen children, one teacher, and one paraprofessional, as well as D.B.'s one-on-one aide.  Every week, he received five speech therapy sessions, two occupational therapy sessions, and one physical therapy session.  These sessions proved useful.  An evaluation conducted by a speech pathologist in late 2001 reveals that D.B. could produce sounds approximating twelve words, sign about twenty-five words, gesture yes or no, and use the PECS to make choices but not to express feelings or call for attention.  However, progress reports suggest that D.B. had trouble learning to operate the DynaMyte 3100, an augmentative communication device.[1]

D.B. entered kindergarten in the fall of 2002, when he was nearly six years old.  In the mornings, pursuant to his 2002 IEP, he received one-on-one academic tutoring and attended various therapy sessions.  In the afternoons, he rejoined his kindergarten classmates for lunch, recess, rest, and play.  Despite making some developmental progress, D.B. still lagged far behind his classmates in important ways.  For example, D.B. remained in diapers throughout his time in the Sutton school system.  Carrying rubber

---

[1] A DynaMyte 3100 user inputs his or her message by touching images on a screen.  The device then "speaks" the message with a digital voice.

gloves and pull-up diapers, his one-on-one aide always accompanied him to the bathroom past other children, who could deduce that D.B. was not toilet trained. D.B. also was unable to begin cultivating foreign language skills like his classmates.

A multidimensional evaluation conducted in the winter of 2002 revealed that D.B., then age six, displayed the neuropsychological development and linguistic abilities of a two- or three-year-old, and the gross motor skills of a three- or four-year-old. However, the evaluation also revealed that D.B.'s communication and focus had improved. He was using approximately eighty signs, could identify six capital letters and three written words, and appeared comfortable with his classmates. By June 2003, D.B. could follow two-step directions and could identify basic shapes, eight written words, and the letters in his name. He spent nine weeks during the summer of 2003 in supplemental speech therapy with a licensed therapist, Amy Kulcsar, and returned to kindergarten in the fall. Kulcsar continued to work with D.B. outside of school.

In January 2004, D.B.'s parents met with various representatives from the Sutton school system to discuss D.B.'s 2004 IEP, which was scheduled to be implemented in February 2004. D.B. could then identify all twenty-six capital letters and twenty-four lower case letters, albeit inconsistently, and could make most long vowel sounds and some consonant sounds. However, he often

required prompting and still had difficulty focusing. Although the 2004 IEP did not recommend additional services, D.B.'s parents requested that the school system pay for D.B.'s ongoing supplemental speech therapy with Kulcsar. After an initial denial, an agreement was reached that provided for the school system's funding of Kulcsar's services during the upcoming summer, and the 2004 IEP went into effect.

In the summer of 2004, D.B.'s parents enrolled him in a six-week course at the Lindamood-Bell Learning Center, a private facility offering intensive language and literacy tutorials to disabled students. D.B.'s progress, however, was slow. Also in the summer of 2004, D.B.'s parents received a letter from Kirsten Esposito, who was then the Director of Special Education for the Sutton school system. The letter summarized D.B.'s 2004 IEP and described "how [D.B.'s] daily routines [would] be implemented" when school resumed in the fall. The letter instructed D.B.'s parents to "drop [D.B.] off in the main entrance of the [school] and pick him up in the auditorium with the other families." Previously, D.B.'s mother, Elizabeth, had accompanied D.B. to his classroom each morning.

In the fall of 2004, D.B. advanced to first grade. One morning early in the school year, D.B.'s one-on-one aide met Elizabeth and D.B. at the school's main entrance and reiterated the drop-off instructions in Esposito's letter. Not wishing to start

a fight in front of D.B., Elizabeth returned to her car and observed other parents accompanying their children into the school. Shortly thereafter, D.B.'s father, David, responded to Esposito's letter, stating that he and Elizabeth felt "singled out" by Esposito's drop-off instructions. Esposito replied that she had never "indicated that [Elizabeth] was not wanted on the school premises" and that her drop-off instructions were intended to facilitate "a smooth transition into [the school] year."

During the 2004-2005 school year, D.B. continued to receive therapy and one-on-one academic tutoring, but he spent more time with his classmates than he had in kindergarten. He also underwent an evaluation conducted by a speech pathologist, Teresa Dooley-Smith, who opined that D.B. communicated most effectively with sign language and struggled with the DynaMyte 3100. Dooley-Smith also noted that D.B. was a good candidate for a multi-sensory, structured learning program, like the course at the Lindamood-Bell Learning Center.

After receiving Dooley-Smith's evaluation, representatives of the Sutton school system met with D.B.'s parents on three occasions to discuss D.B.'s 2005 IEP, which was scheduled to be implemented in February 2005. D.B. then knew over one hundred words and used twenty-seven regularly; spoke phrases of two to four words; followed simple directions; could enunciate fifteen consonant sounds; was more focused; and could identify seven

written words and the numerals 0 through 15.  Although the 2005 IEP kept in place D.B.'s therapy and tutoring, it also, in line with Dooley-Smith's evaluation, provided for a multi-sensory, structured learning program - the Sutton school system's language-based resource program.  Like D.B., the other students in this program were disabled.  Most had less significant developmental delays than D.B.

The 2005 IEP never went into effect.  Instead, in February 2005, David sent Esposito a nine-page letter describing his concerns with the 2005 IEP and with the Sutton school system. Among these concerns was the behavior of one of D.B.'s therapists:

> [The therapist] implicitly called [Elizabeth] a liar when [Elizabeth] told her that [D.B.] was saying particular words in a natural environment. . . . [The therapist] attempted to have [D.B.] repeat the words on demand . . . .  Anyone with any knowledge of severe apraxia would know that a severely apraxic child would not deliver a word under pressure and on demand.  Indeed, some people to whom we have related this incident have stated that this was child abuse.

Esposito placed David's letter in D.B.'s file after redacting the paragraph relating to the therapist's behavior.  She then e-mailed the Sutton school system's attorney for legal advice, referring to David's letter as "defamatory and libelous" and explaining that her redaction was intended to shield the therapist from David's accusations.  Esposito placed a copy of her e-mail alongside David's letter in D.B.'s file.

Shortly thereafter, in March 2005, D.B.'s parents removed D.B. from the Sutton public school system and enrolled him in the Lindamood-Bell Learning Center.

## B.  Procedural Background

### 1.  Bureau of Special Education Appeals

In March 2005, as a result of D.B.'s removal from public school, the Sutton school system invoked its right to an administrative due process hearing before the BSEA, claiming that the 2005 IEP was adequate insofar as it would have provided D.B. with a free appropriate public education ("FAPE") as required by the IDEA and, relatedly, that it was not required to reimburse D.B.'s parents for tuition costs at the Lindamood-Bell Learning Center.  D.B.'s parents counterclaimed that they were entitled to reimbursement because the 2005 IEP was inadequate.  They also claimed that the Sutton school system had discriminated against D.B. on the basis of his disability and had violated privacy laws by publicly disclosing D.B.'s confidential information.

A BSEA due process hearing was held over eight days between June 28, 2006, and October 12, 2006.  During the hearing, the IHO received over three hundred exhibits and heard testimony from sixteen witnesses, including D.B.'s parents.  On March 26, 2007, the IHO issued a lengthy decision in favor of the Sutton school system.  In the decision, the IHO noted that "the IDEA does not require [school] districts to maximize a student's potential,

but rather to assure access to a public education and the opportunity for meaningful educational benefit." The IHO also observed that some courts have held that the meaningfulness of a benefit "should be measured in light of the student's individual potential." However, due to the severity of D.B.'s disabilities, the IHO found that D.B.'s potential for learning and self-sufficiency could not be determined. Nevertheless, the IHO found that there was ample evidence that, while a student in the Sutton school system, D.B. had made "slow but measurable progress in all identified areas of need, generally meeting most or all of his IEP goals," and that the 2005 IEP would have continued the one-on-one tutorials and therapy sessions from which D.B. had benefitted previously. Accordingly, the IHO concluded that the 2005 IEP was adequate.

## 2. District Court

Appellants sought review of the IHO's decision in the Massachusetts state court. After the suit was timely removed to the United States District Court for the District of Massachusetts, appellants filed a ten-count amended complaint, the final count of which raised their IDEA claim. The first four counts raised discrimination and retaliation claims under the Rehabilitation Act and the ADA. The next four counts raised a retaliation claim under the First Amendment pursuant to § 1983 and re-raised appellants' IDEA claim and discrimination claims pursuant to §§ 1983 and 1985.

The ninth count raised a due process claim under the Fourteenth Amendment. The Sutton School District, the Sutton School Committee, Esposito, and DiBella were named in all ten counts. The Massachusetts Department of Education was named only in the tenth count.

Appellees filed an unsuccessful motion to dismiss the amended complaint. Both sides then filed cross-motions for summary judgment on Count 10, and appellees followed up with a motion for summary judgment on Counts 1 - 9. The district court bifurcated the summary judgment proceedings, ruling on Count 10 in September 2009, and Counts 1 - 9 in September 2010.

In considering the IDEA claim raised in Count 10, the district court addressed the first issue presented here on appeal - whether it was error for the IHO to conclude that the 2005 IEP complied with the IDEA without first determining D.B.'s potential for learning and self-sufficiency. The court noted that, due to the complexity of D.B.'s disability, his potential could not be "ascertained with any substantial degree of confidence." Still, the court found that D.B. had received some meaningful educational benefit from the Sutton school system. The court also found that this benefit, "even if less than optimal, was likely to continue under the [2005] IEP," and held that the continued benefit "would have been sufficient to satisfy the IDEA." Accordingly, the court granted appellees' motion for summary judgment on Count 10.

In considering Counts 1 - 9, the district court relied heavily on its earlier disposition of Count 10. It interpreted the discrimination claims in Counts 1 and 3, and the §§ 1983 and 1985 claims in Counts 5, 6, and 8, as disguised IDEA claims nominally brought under other provisions of federal law. Having already established that no IDEA violation had occurred, it denied these claims on that basis. In contrast, the court interpreted the retaliation claims in Counts 2, 4, and 7 as non-IDEA claims and scrutinized them carefully, ultimately concluding that they were insufficiently supported by evidence to justify a trial. The court also noted that appellants had consented to the dismissal of the due process claim in Count 9. Accordingly, the court granted appellees' motion for summary judgment on Counts 1 - 9.

This appeal followed.

## II.

We structure our consideration of appellants' claims as the district court did, beginning with the IDEA claim raised in Count 10 and then turning to the remaining claims.

## A. The IDEA Claim

### 1. Statutory Framework

"Congress designed the IDEA as part of an effort to help states provide educational services to disabled children." C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist., 513 F.3d 279, 284 (1st Cir. 2008); see also Schaffer ex rel. Schaffer v. Weast, 546 U.S.

49, 52 (2005).[2]  The IDEA aims to prepare children with disabilities for independent living and a reasonable measure of self-sufficiency where possible.  See 20 U.S.C. § 1400(c)(1), (d)(1)(A); Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 201 n.23 (1982).

To that end, a state receiving federal funding under the IDEA must offer a FAPE to every disabled child within its jurisdiction.  See 20 U.S.C. § 1412(a)(1)(A).  "A FAPE encompasses special education and support services provided free of charge." C.G., 513 F.3d at 284 (citing 20 U.S.C. § 1401(9)).  "If a school system is unable to furnish a disabled child with a FAPE through a public school placement, it may be obliged to subsidize the child in a private program."  Id.

The "primary vehicle" for delivery of a FAPE is an IEP. Lessard v. Wilton-Lyndeborough Coop. Sch. Dist. (Lessard I), 518 F.3d 18, 23 (1st Cir. 2008); see also D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 557 (3d Cir. 2010) ("The IEP is . . . the centerpiece of the IDEA's system for delivering education to disabled children." (internal quotation marks omitted)).  An IEP must be "individually designed" to suit a particular child, Rowley, 458

---

[2] Congress first passed the IDEA in 1970 as part of the Education of the Handicapped Act and amended it substantially in the Education for All Handicapped Children Act of 1975, see Schaffer, 546 U.S. at 51-52, finally restyling it as the IDEA in 1990, see Doe v. Boston Public Sch., 358 F.3d 20, 23 n.2 (1st Cir. 2004).

U.S. at 201, and must include, "at a bare minimum, the child's present level of educational attainment, the short- and long-term goals for his or her education, objective criteria with which to measure progress toward those goals, and the specific services to be offered," Lessard I, 518 F.3d at 23 (citing 20 U.S.C. § 1414(d)(1)(A)); see also Schaffer, 546 U.S. at 53.

However, "the obligation to devise a custom-tailored IEP does not imply that a disabled child is entitled to the maximum educational benefit possible." Lessard I, 518 F.3d at 23; see also Rowley, 458 U.S. at 198; Lt. T.B. ex rel. N.B. v. Warwick Sch. Comm., 361 F.3d 80, 83 (1st Cir. 2004). The Supreme Court has said that an IEP must offer only "some educational benefit" to a disabled child. Rowley, 458 U.S. at 200. Thus, the IDEA sets "modest goals: it emphasizes an appropriate rather than an ideal, education; it requires an adequate, rather than an optimal, IEP." Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086 (1st Cir. 1993). At the same time, the IDEA calls for more than a trivial educational benefit, in line with the intent of Congress to establish a "federal basic floor of meaningful, beneficial educational opportunity." Town of Burlington v. Dep't of Educ. of Mass., 736 F.2d 773, 789 (1st Cir. 1984). Hence, to comply with the IDEA, an IEP must be reasonably calculated to confer a meaningful educational benefit. See D.S., 602 F.3d at 557 ("[T]he IEP must be reasonably calculated to enable the child to receive

meaningful educational benefits . . . ." (internal quotation marks omitted); D.F. ex rel. N.F. v. Ramapo Cent. Sch. Dist., 430 F.3d 595, 598 (2d Cir. 2005) ("A valid IEP should provide for the opportunity for more than trivial advancement . . . such that the door of public education is opened for a disabled child in a meaningful way." (internal quotation marks and citation omitted)); Deal v. Hamilton Cnty. Bd. of Educ., 392 F.3d 840, 862 (6th Cir. 2004) ("[T]he IDEA requires an IEP to confer a meaningful educational benefit . . . ." (internal quotation marks omitted)).

To ensure the continued adequacy of a child's IEP, the IDEA requires that it be reevaluated annually through a collaborative process that involves the child's parents and educators. See 20 U.S.C. § 1414(d); Schaffer, 546 U.S. at 53; Lessard I, 518 F.3d at 23; Me. Sch. Admin. Dist. No. 35 v. Mr. R., 321 F.3d 9, 12 (1st Cir. 2003). If this process breaks down and no consensus emerges, the child's parents may challenge either the school system's handling of the IEP process or the substantive adequacy of the IEP itself by demanding an administrative due process hearing before a designated state educational agency. See 20 U.S.C. § 1415(f)(1)(A); Lenn, 998 F.2d at 1086. A public school system has essentially the same right if, for example, it seeks to test the validity of a proposed IEP or it wishes to challenge an existing IEP as over-accommodating. See Schaffer, 546 U.S. at 53; Lessard v. Wilton-Lyndeborough Coop. Sch. Dist. (Lessard II), 592

F.3d 267, 269 (1st Cir. 2010) (per curiam).  The burden of persuasion in the resulting hearing lies with the party challenging the IEP.  See Schaffer, 546 U.S. at 62.[3]  Having exhausted the IDEA's administrative due process hearing procedures, "[e]ither side may then appeal from the hearing officer's final decision to either a federal or state court of competent jurisdiction." Lessard I, 518 F.3d at 24; see also 20 U.S.C. § 1415(i)(2)(A); C.G., 513 F.3d at 285.

### 2.  The 2005 IEP

Appellants complained to the district court that the IHO erred in concluding that the 2005 IEP complied with the IDEA without first determining D.B.'s potential for learning and self-sufficiency.  In light of that alleged error, they argue to us that the district court should not have upheld the IHO's decision.  They do not dispute that, as the party challenging the 2005 IEP, they

---

[3] Until 2005, we joined most other circuits in holding that "the school district always bears the burden in the due process hearing of showing that its proposed IEP is adequate." Lt. T.B., 361 F.3d at 82 n.1.  In 2005, though, the Supreme Court decided Schaffer, which clarified that "[t]he burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." 546 U.S. at 62.  We understand this to mean that a school system does not incur the burden of proof merely by preemptively seeking an administrative determination that a proposed IEP would comply with the IDEA, as in this case.  In that instance, the school system is defending the adequacy of the IEP, not challenging it.  See id. ("[T]he rule applies with equal effect to school districts: If they seek to challenge an IEP, they will in turn bear the burden of persuasion before an ALJ." (emphasis added)).  However, if a school system challenges an existing IEP as over-accommodating, the burden presumably lies with the school system.

bore the burden of persuasion in the administrative due process hearing before the IHO.  See Schaffer, 456 U.S. at 62.

The standard applied by the district court to its review of the IHO's decision differs from the standard we apply to our review of the district court's decision.  See Lt. T.B., 361 F.3d at 83.  "[A] district court reviews the administrative record, which may be supplemented by additional evidence from the parties, and makes an independent ruling based on the preponderance of the evidence."  Id. (internal quotation marks omitted).  However, "[t]hat independence is tempered by the requirement that the court give due weight to the hearing officer's findings."  Id. (internal quotation marks omitted).  As a result, a district court's review "falls somewhere between the highly deferential clear-error standard and the non-deferential de novo standard."  Lessard I, 518 F.3d at 24.  We have characterized this intermediate level of review as "one of involved oversight."  Lenn, 998 F.2d at 1087 (internal quotation marks omitted).

Our review of the district court's order is more traditional.  We examine the record as a whole and "review the district court's answers to questions of law de novo and its findings of fact for clear error."  C.G., 513 F.3d at 284; see also Lessard II, 592 F.3d at 269; Lenn, 998 F.2d at 1087.  Whether an IEP is adequate is a mixed question of law and fact, and our degree

of deference depends on whether a particular determination is dominated by law or fact.  See C.G., 513 F.3d at 284.

The appeal from the summary judgment entered on the IDEA claim raised in Count 10 requires us to resolve both a legal issue and a closely related factual one, as well as a mixed question of law and fact.  We begin our discussion with the legal issue - whether a determination as to a child's potential for learning and self-sufficiency must precede a determination that the child's IEP complies with the IDEA.

### a.  The Legal Issue

In Polk v. Central Susquehanna Intermediate Unit 16, the Third Circuit held that the educational benefit of a child's IEP "must be gauged in relation to the child's potential."  853 F.2d 171, 185 (3d Cir. 1988); see also Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S., 381 F.3d 194, 198 (3d Cir. 2004) ("The IEP must be 'reasonably calculated' to enable the child to receive 'meaningful educational benefits' in light of the student's 'intellectual potential.'" (quoting Polk, 853 F.2d at 181)).  As the Sixth Circuit subsequently explained, there is some intuitive appeal to this view: children of different abilities are capable of different achievements, and "[o]nly by considering an individual child's capabilities and potentialities may a court determine whether an educational benefit provided to that child allows for meaningful advancement."  Deal, 392 F.3d at 864.  We have intimated

as much ourselves, citing <u>Polk</u> for the proposition that "levels of progress must be judged with respect to the potential of the particular child," <u>Lessard I</u>, 518 F.3d at 29, and we recognize that the BSEA has incorporated this view into its proceedings, <u>see</u>, <u>e.g.</u>, <u>In re Fall River Pub. Sch.</u>, 11 Mass. Spec. Educ. Rep. 242, 254 (BSEA 05-5383) (2005) (considering child's potential in assessing IEP). In most cases, an assessment of a child's potential will be a useful tool for evaluating the adequacy of his or her IEP.

Developmental disability takes many forms, however. It is not always feasible to determine a disabled child's potential for learning and self-sufficiency with any precision, particularly where the child's disability significantly impairs his or her capacity for communication. In that situation, even without a complete understanding of the upper limits of the child's abilities, there can still be an assessment of the likelihood that the IEP will confer a meaningful educational benefit by measurably advancing the child toward the goal of increased learning and independence. If an IEP is reasonably calculated to confer such a benefit, it complies with the IDEA.

For example, if a child's potential is unknowable, his or her IEP still could be reasonably calculated to confer a meaningful educational benefit if it is closely modeled on a previous IEP pursuant to which the child made appreciable progress. <u>See</u>

-21-

Thompson R2-J Sch. Dist. v. Jeff P. ex rel. Luke P., 540 F.3d 1143,
1153 (10th Cir. 2008). Of course, previous success does not
guarantee future success. Cf. Rome Sch. Comm. v. Mrs. B., 247 F.3d
29, 32 (1st Cir. 2001) ("[T]he IDEA recognizes that children's
needs change over time, and it thus requires annual evaluation and
development of an IEP for each school year."). Nevertheless, if
the two IEPs are substantially similar in design, that similarity
provides a reasonable basis for assessing the likelihood of future
progress. See Jeff P., 540 F.3d at 1153 ("Such past progress is,
of course, not dispositive of the controlling question whether,
going forward, the [new] IEP was reasonably calculated to confer
some educational benefit, but it does strongly suggest that,
modeled on prior IEPs that had succeeded in generating some
progress, the [new] IEP was reasonably calculated to continue that
trend."). Accordingly, we agree with the district court that a
determination as to a child's potential for learning and self-
sufficiency does not have to precede a determination that the
child's IEP complies with the IDEA.

### b. The Factual Issue

The factual issue, then, is whether there was any clear
error in the district court's finding that D.B.'s potential was
unknowable. Echoing the IHO's view that D.B.'s "baseline cognitive
abilities are the subject of debate and have been difficult to
assess because of his communication disorders and difficulty with

attention," the district court found that "[a]ssessing D.B.'s capabilities presents a significant, perhaps impossible, challenge" and that D.B.'s potential for learning and self-sufficiency "simply cannot be ascertained with any substantial degree of confidence." The district court took particular care to document the relevant evidence, focusing on the difficulties associated with testing D.B. For example, the court cited Dooley-Smith's observation that D.B.'s "cognitive levels are not accurately known at this time," a Lindamood-Bell Learning Center staff member's comment that "it was very difficult . . . to gauge [D.B.'s] potential in terms of his language skills," and an independent evaluator's warning that "[i]n light of [D.B.'s] difficulties, the test results . . . may not accurately represent his cognitive potential." The court also referred to statements by Marsha Chaskelson and Shelly Velleman - two witnesses called by D.B.'s parents at the BSEA hearing - highlighting the indeterminacy of D.B.'s potential.

Taken together, this evidence precludes any judgment by us that the district court clearly erred in finding that D.B.'s potential for learning and self-sufficiency was unknowable.

### c. The Mixed Question

We turn now to the mixed question of law and fact, which is whether the 2005 IEP complied with the IDEA because it was reasonably calculated to confer a meaningful educational benefit. The IHO's opinion as to the adequacy of the 2005 IEP was based on

-23-

findings that D.B.'s previous IEPs had resulted in meaningful advancement, and that the 2005 IEP kept in place the therapy and tutoring services offered by the previous IEPs, while supplementing those services with the multi-sensory, structured learning program recommended by Dooley-Smith:

> [D.B.'s] progress was meaningful. Despite enormous challenges, [D.B.] developed from a child who did not speak at all and only had access to a few signs to a child who could communicate many of his wants and needs via sign, spoken words, and emerging use of augmentative communication, who was developing pre-reading skills, whose physical skills had improved enormously. There is no reason to believe that [D.B.] would not have made continued, and likely more rapid progress in the newly-proposed program.

The district court also looked to D.B.'s progress under his previous IEPs and "agree[d] with the IHO that this progress, even if less than optimal, was likely to continue under the new IEP and would have been sufficient to satisfy the IDEA."

It was not error for the IHO and the district court to conclude retrospectively that D.B.'s previous IEPs had resulted in meaningful educational benefits. While in the Sutton school system, D.B. had developed from a nonverbal and unfocused child into a "total communicator" who, by the time the 2005 IEP was scheduled to be implemented, knew over one hundred words, spoke short phrases, followed simple directions, was more focused, and could identify seven written words and the numerals 0 through 15. Even without knowing the upper limit of D.B.'s potential for

learning and self-sufficiency, we have no trouble concluding that these achievements were meaningful for him, and advanced him measurably toward the goal of increased learning and independence. See R.P. ex rel. C.P. v. Prescott Unified Sch. Dist., 631 F.3d 1117, 1123 (9th Cir. 2011) (upholding district court's conclusion that IEP delivered meaningful benefit on analogous facts).[4]  It also was not error to conclude prospectively that, since D.B.'s previous IEPs had conferred meaningful educational benefits, the 2005 IEP was reasonably calculated to do the same, having kept in place, and even supplemented, the services offered by the previous IEPs.  See Jeff P., 540 F.3d at 1153.  Accordingly, we affirm the district court's grant of summary judgment on the IDEA claim raised in Count 10.

---

[4] Like D.B., the disabled child in R.P. "didn't progress at a constant, linear rate in all areas.  But he did progress."  631 F.3d at 1123.  The court found this progress to be meaningful:

> When he began school, he could name some objects and a few pictures, had a short attention span and ran from adults.  By the end of the 2005-06 school year, he could say many words and form phrases to express a complete thought.  He had learned to respond to the word "no" and to listen to adults.  He was able to drink from a cup without assistance and to put things away.  He was becoming skilled at figuring out puzzles and his coloring skills had improved.  He could wash his hands independently and assist in pulling up his pants.

Id.

## B.  The Remaining Claims

Appellants' remaining claims are divisible into three categories.  We discuss them accordingly, reviewing the district court's grant of summary judgment de novo and drawing all reasonable inferences in appellants' favor.  See Cortés-Rivera v. Dep't of Corr. & Rehab., 626 F.3d 21, 26 (1st Cir. 2010).  Counts 1 and 3 raise discrimination claims under the Rehabilitation Act and Title II of the ADA.  Counts 2, 4, and 7 raise retaliation claims under the Rehabilitation Act, Title V of the ADA, and the First Amendment.  Counts 5, 6, and 8 repeat appellants' IDEA claim and discrimination claims pursuant to §§ 1983 and 1985.

All of these claims implicate the interplay between the IDEA and other sources of law.  In Diaz-Fonseca v. Puerto Rico, we held that reconstituted IDEA claims cannot be brought under other federal statutes in an attempt to secure remedies that are unavailable under the IDEA.  See 451 F.3d 13, 29 (1st Cir. 2006) ("[W]here the underlying claim is one of violation of the IDEA, plaintiffs may not use § 1983 - or any other federal statute for that matter - in an attempt to evade the limited remedial structure of the IDEA.").  However, we also made clear that "the IDEA does not restrict rights and remedies that were already independently available through other sources of law." Id. (citing 20 U.S.C. § 1415(l)).  Thus, plaintiffs cannot disguise an IDEA claim in other garb "[w]here the essence of the claim is one stated under

the IDEA for denial of FAPE," id. at 19, but are not otherwise barred from bringing a non-IDEA claim alongside an IDEA claim, even if there is some overlap between the two claims.[5]

### 1. Counts 1 and 3

The discrimination claims in this case are brought under the Rehabilitation Act and the ADA, both of which contain provisions prohibiting discrimination against a disabled person on the basis of his or her disability. See Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004). The Rehabilitation Act applies to federal agencies and recipients of federal funding, see 29 U.S.C. § 794(a); Title II of the ADA applies to state and local governments, as well as private employers with over fifteen employees, see 42 U.S.C. § 12132; Calero-Cerezo, 355 F.3d at 19.[6]

---

[5] Like an IDEA claim, a non-IDEA claim that seeks relief also available under the IDEA must be exhausted administratively through the IDEA's due process hearing procedures before it can be brought in a civil action in state or federal court. See 20 U.S.C. § 1415(l); see also Rose v. Yeaw, 214 F.3d 206, 209-11 (1st Cir. 2000); Weber v. Cranston Sch. Comm., 212 F.3d 41, 49-53 (1st Cir. 2000). However, no party has addressed the applicability vel non of this exhaustion requirement to appellants' non-IDEA claims, and we decline to do so sua sponte.

[6] The Rehabilitation Act provides in relevant part: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a

The claims themselves are easy enough to describe. Appellants complain that the Sutton school system discriminated against D.B. by (1) requiring that he develop foreign language skills for which he was unsuited, (2) misdiagnosing his potential in order to mask missteps in his education, (3) forcing him to use the DynaMyte 3100 despite his obvious struggles with it, (4) failing to accommodate his lack of toilet training, and (5) exposing him to ridicule by permitting his one-on-one aide to accompany him past other children to the bathroom carrying rubber gloves and pull-up diapers.[7]

The district court understood these claims to be no different than the IDEA claim raised in Count 10: "Although they purport to be independent claims, it is clear that they are coextensive with, based upon rights created by, and seek relief no different from, the IDEA claim." Having already determined that

---

public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

[7] Appellants also complain on appeal that the school system posted D.B.'s private medical information on a public wall at his school and did not address his social alienation. Because these complaints were not made to the district court, we will not consider them. See CoxCom, Inc. v. Chaffee, 536 F.3d 101, 109 n.10 (1st Cir. 2008) ("[A]ny argument not made before the district court will not be reviewed on appeal."). In addition, we will not consider the many allegations of discrimination in the amended complaint that have not been pursued on appeal. See Baybank-Middlesex v. Ralar Distrib., Inc., 69 F.3d 1200, 1203 n.5 (1st Cir. 1995) ("We will not consider potentially applicable arguments that are not squarely presented in a party's appellate brief.").

there had been no IDEA violation, the district court denied these claims, too.

Although the district court's rejection of the discrimination claims was correct, its explanation of the relationship between the IDEA claim and the discrimination claims was not. Certainly, appellants' discrimination complaints overlap with the IDEA claim raised in Count 10, insofar as they invoke either the substance or the implementation of the 2005 IEP. In essence, appellants are complaining that D.B. was discriminatorily denied a FAPE. However, because the IDEA "is simply not an anti-discrimination statute," Ellenberg v. N.M. Military Inst., 478 F.3d 1262, 1281 (10th Cir. 2007), a discrimination claim under the Rehabilitation Act or the ADA involving a denial of a FAPE is not coextensive with an IDEA claim. See Miller v. Bd. of Educ. of Albuquerque Pub. Sch., 565 F.3d 1232, 1245-46 (10th Cir. 2009); Mark H. v. Lemahieu, 513 F.3d 922, 925 (9th Cir. 2008). To prevail on an IDEA claim, a plaintiff must show that he or she has a qualifying disability and has been denied a FAPE. To prevail on a discrimination claim under the Rehabilitation Act or the ADA involving a denial of a FAPE, a plaintiff must make an additional showing that the denial resulted from a disability-based animus. See Miller, 565 F.3d at 1246; cf. Lesley v. Hee Man Chie, 250 F.3d 47, 53 (1st Cir. 2001) (articulating elements of Rehabilitation Act discrimination claim); Parker v. Universidad de P.R., 225 F.3d 1,

5 (1st Cir. 2000) (articulating elements of ADA discrimination claim).

Even so understood, appellants' discrimination claims fail. The district court agreed with the IHO that there was no denial of a FAPE. We have now affirmed that ruling, which necessarily precludes any claim that there was a discriminatory denial of a FAPE.[8]

### 2. Counts 2, 4, and 7

Counts 2 and 4 raise retaliation claims under the Rehabilitation Act and Title V of the ADA, and Count 7 raises a retaliation claim under the First Amendment pursuant to § 1983. Both the Rehabilitation Act, through its implementing regulations, see 28 C.F.R. § 42.503(b)(1)(vii), and the ADA, see 42 U.S.C. § 12203(a), prohibit retaliation against any person, whether disabled or not, for opposing disability-based discrimination made

---

[8] Nevertheless, it is important to understand that Diaz-Fonseca does not bar a plaintiff from bringing a discrimination claim based on a denial of a FAPE in conjunction with an IDEA claim, because the discrimination claim involves the additional element of disability-based animus. As such, the discrimination claim does not "turn[] entirely on the rights created by statute in the IDEA." Diaz-Fonseca, 451 F.3d at 29. To read Diaz-Fonseca otherwise conflates two causes of action merely because they share some common elements, and undercuts the IDEA's explicit caveat that it does not restrict or limit the rights, procedures, and remedies available under the Rehabilitation Act or the ADA. See 20 U.S.C. § 1415(l); Mark H., 513 F.3d at 934 ("Congress has clearly expressed its intent that remedies be available under . . . the Rehabilitation Act for acts that also violate the IDEA.").

-30-

unlawful by those statutes.[9]  A plaintiff need not succeed on a disability discrimination claim in order to assert a claim for retaliation.  See Colón-Fontánez v. Municipality of San Juan, 660 F.3d 17, 36 (1st Cir. 2011).  The First Amendment, of course, also prohibits retaliation for protected conduct.  See González-Droz v. González-Colón, 660 F.3d 1, 16 (1st Cir. 2011); Powell v. Alexander, 391 F.3d 1, 16 (1st Cir. 2004) ("Claims of retaliation for the exercise of First Amendment rights are cognizable under § 1983.").

Like their discrimination claims, appellants' retaliation claims overlap, in part, with their IDEA claim.  However, the retaliation claims "rest on improper retaliatory intent, are by no means mirrors of the IDEA, and are not within the rationale of Diaz-Fonseca." Ramírez-Senda ex rel. M.M.R.-Z. v. Puerto Rico, 528 F.3d 9, 15 (1st Cir. 2008).

### a. The Rehabilitation Act and ADA Claims

The standard for retaliation claims under the Rehabilitation Act is the same as the standard under the ADA.  See

---

[9] The regulations implementing the Rehabilitation Act make it unlawful to "[i]ntimidate or retaliate against any individual, whether handicapped or not, for the purpose of interfering with any right secured by [the Rehabilitation Act]."  28 C.F.R. § 42.503(b)(1)(vii).  Title V of the ADA provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).

Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d 1126,
1131 (10th Cir. 2010).   To make out a prima facie case of
retaliation under the familiar burden-shifting framework
articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792,
801-03 (1973), a plaintiff must show that (1) he or she engaged in
protected conduct, (2) he or she was subjected to an adverse action
by the defendant, and (3) there was a causal connection between the
protected conduct and the adverse action.   See Carreras v. Sajo,
García & Partners, 596 F.3d 25, 35 (1st Cir. 2010); Reinhardt, 595
F.3d at 1131; Quiles-Quiles v. Henderson, 439 F.3d 1, 8 (1st Cir.
2006).  Once a plaintiff makes such a showing, the burden shifts to
the defendant to articulate a legitimate, non-retaliatory
explanation for the adverse action.  See Carreras, 596 F.3d at 36.
If the defendant does so, the burden shifts back to the plaintiff
to show that the proffered legitimate explanation is pretextual,
meaning that the defendant was motivated by a retaliatory animus.
See id.

The general thrust of appellants' claims is that the
Sutton school system retaliated against them for advocating on
behalf of D.B.'s right under the Rehabilitation Act and the ADA to
be free from disability-based discrimination in the provision of a
FAPE.  Such advocacy plainly constitutes protected conduct under
these statutes.  See Reinhardt, 595 F.3d at 1132 ("[A]ttempting to
protect the rights of special education students constitutes

protected activity under the Rehabilitation Act."); <u>Barker</u> v. <u>Riverside Cnty. Office of Educ.</u>, 584 F.3d 821, 826 (9th Cir. 2009) (holding that advocacy on behalf of disabled students on issues related to their civil rights is protected activity under the Rehabilitation Act and the ADA); <u>Weixel</u> v. <u>Bd. of Educ. of New York</u>, 287 F.3d 138, 149 (2d Cir. 2002) (holding that seeking reasonable accommodation for disabled student's disability is protected activity under the Rehabilitation Act and ADA).

Moreover, we assume without deciding, as we have done in other cases, <u>see</u>, <u>e.g.</u>, <u>Martinez-Burgos</u> v. <u>Guayama Corp.</u>, 656 F.3d 7, 13 (1st Cir. 2011), that the school system subjected appellants to a number of adverse actions. An adverse action is one that might well dissuade a reasonable person from making or supporting a charge of discrimination. <u>See</u> <u>Colón-Fontánez</u>, 660 F.3d at 36-37; <u>Reinhardt</u>, 595 F.3d at 1133. The actions appellants cite as adverse include downplaying D.B.'s potential for learning and self-sufficiency; failing to timely apprise appellants of a June 22, 2005 meeting concerning D.B.'s 2005 IEP; misstating narrative accounts of meetings concerning the 2005 IEP; failing on one occasion to respond to a letter from appellants; refusing to incorporate the Lindamood-Bell Learning Center curriculum into the 2005 IEP; preventing D.B.'s parents from escorting D.B. to his classroom; and placing in D.B.'s file for any school system employee to see a copy of the letter in which his father criticized

D.B.'s therapist, which had been redacted in such a way as to blur
its meaning.

We also assume without deciding that appellants have
shown a causal connection between their protected conduct and these
actions.  All of the relevant events in this case took place within
a condensed time frame.  We have said that close temporal proximity
between protected conduct and an adverse action sometimes "may
suffice for a prima facie case of retaliation." Carreras, 596 F.3d
at 38; see also Quiles-Quiles, 439 F.3d at 8-9.

In response to appellants' prima facie case of
retaliation, the school system must articulate a legitimate,
non-retaliatory explanation for its actions.  See Carreras, 596
F.3d at 36.  Most of the adverse actions in appellants' litany
involve either the substantive adequacy of D.B.'s 2005 IEP or the
school system's handling of the IEP process.  The school system has
explained that the contents of the 2005 IEP reflect a careful
pedagogic assessment of the services necessary to provide D.B. with
a FAPE under the IDEA.  For example, the decision not to
incorporate the Lindamood-Bell Learning Center curriculum into the
2005 IEP was made because the school system's own multi-sensory,
structured learning program was thought to be sufficient to meet
D.B.'s educational needs.  The school system also has explained
that its conduct of the IEP process, which anticipates a vigorous
dialogue, conformed to the IDEA's procedural requirements and

reflected a good-faith effort to collaborate with appellants. For example, the failure to timely apprise appellants of the June 22, 2005 meeting concerning the 2005 IEP was the result of an oversight involving the school system's attorneys, and notice was mailed to appellants on June 17, 2005, once the oversight was discovered.

Compliance with the IDEA does not necessarily disprove a claim under the Rehabilitation Act or the ADA that a school system retaliated against a disabled student, or the student's family, for advocating on behalf of the student's right to be free from disability-based discrimination in the provision of a FAPE. For example, a school system that is compliant with the IDEA might retaliate against a disabled student by withholding additional services or accommodations the student otherwise would have received. A school system also might retaliate by making the process of designing the student's curriculum unusually contentious. However, in the face of a school system's compliance with the IDEA, as in this case, a plaintiff who asserts that the content of an IEP or the conduct of an IEP process was retaliatory must show evidence of something more than a disappointing IEP or the predictable back-and-forth associated with the IEP process in order to survive summary judgment. Appellants have not done so, and thus have not shown that the school system's legitimate, non-retaliatory explanations for its actions were pretextual.

Accordingly, no reasonable fact finder could find in their favor on

their Rehabilitation Act and ADA retaliation claims.[10]

### b. The First Amendment Claim

Under the First Amendment, retaliation claims proceed in

two stages.  See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,

429 U.S. 274, 287 (1977); Guilloty Perez v. Pierluisi, 339 F.3d 43,

56 (1st Cir. 2003).  A plaintiff must first prove that (1) he or

she engaged in constitutionally protected conduct, (2) he or she

was subjected to an adverse action by the defendant, and (3) the

---

[10] Appellants also have alleged two adverse actions not
involving either the substantive adequacy of the 2005 IEP or the
conduct of the IEP process.  These actions are the prevention of
D.B.'s parents from escorting D.B. to his classroom, and the
redaction and inclusion in D.B.'s file of the letter in which his
father criticized D.B.'s therapist.  Neither strengthens
appellants' retaliation claims.  The school system has explained
that it asked D.B.'s parents not to accompany D.B. to his classroom
in order to ease his transition back to school and to maintain
close control over his schedule.  It also has explained that the
letter from D.B.'s father was redacted to protect D.B.'s therapist
from the letter's accusations and to ameliorate the letter's
"negativity and suggestive implications," which were not thought to
serve D.B.'s interests.  A plaintiff "can establish pretext 'by
showing weaknesses, implausibilities, inconsistencies,
incoherencies, or contradictions in the . . . proffered legitimate
reasons such that a factfinder could infer that the [defendant] did
not act for the asserted non-[retaliatory] reasons.'"  Carreras,
596 F.3d at 37 (quoting Santiago-Ramos v. Centennial P.R. Wireless
Corp., 217 F.3d 46, 56 (1st Cir. 2000)).  Appellants have failed to
make any such showing, relying instead only on speculation and
conclusory allegations.  See Vives v. Fajardo, 472 F.3d 19, 21 (1st
Cir. 2007) ("Even in retaliation cases, 'where elusive concepts
such as motive or intent are at issue, summary judgment is
appropriate if the non-moving party rests merely upon conclusory
allegations, improbable inferences, and unsupported speculation.'"
(quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st
Cir. 2003)).

protected conduct was a substantial or motivating factor in the adverse action.  See González-Droz, 660 F.3d at 16; Gorelik v. Costin, 605 F.3d 118, 123 (1st Cir. 2010); Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 10 (1st Cir. 2005).  "The defendant may then avoid a finding of liability by showing that 'it would have reached the same decision . . . even in the absence of the protected conduct.'"  Powell, 391 F.3d at 17 (quoting Mt. Healthy, 429 U.S. at 287); see also González-Droz, 660 F.3d at 17.

Appellants have not spelled out the protected conduct they believe to be within the ambit of the First Amendment. Therefore, divining their intent, we assume without deciding that their championing of D.B.'s right to a FAPE under the IDEA constitutes protected conduct.  See Jean W. ex rel. Lauren W. v. DeFlaminis, 480 F.3d 259, 266-67 (3d Cir. 2007) (entertaining claim under First Amendment that school system retaliated against parents for enforcing disabled child's right under the IDEA to a FAPE).

We also assume without deciding that the same adverse actions that appellants invoked for their Rehabilitation Act and ADA retaliation claims have satisfied this element of their First Amendment claim.[11]  However, for the same reasons that appellants

_____

[11] Under the First Amendment, an adverse action is an action that would deter a reasonably hardy person from exercising his or her constitutional rights.  See Barton v. Clancy, 632 F.3d 9, 29 (1st Cir. 2011).

were unable to show, for the purposes of their other retaliation claims, that the school system's explanations for its adverse actions were pretextual, they have failed to generate a genuine issue of material fact on the "substantial or motivating factor" element of their First Amendment claim. Hence, their retaliation claim fails.

### 3. Counts 5, 6, and 8

In Counts 5, 6, and 8, appellants reassert their IDEA claim and their Rehabilitation Act and ADA discrimination claims pursuant to §§ 1983 and 1985. These claims also fail. Neither § 1983 nor § 1985 creates substantive rights. See Román-Oliveras v. P.R. Elec. Power Auth., 655 F.3d 43, 47 (1st Cir. 2011) (§ 1983); Akins v. Penobscot Nation, 130 F.3d 482, 490 n.9 (1st Cir. 1997) (§ 1985). Both statutes provide remedies for violations of rights created by other sources of law, with § 1983 supplying a private right of action against a person who, under color of state law, deprives another of rights secured by the Constitution or by federal law, see 42 U.S.C. § 1983, and § 1985, among other things, supplying the same against two or more persons who conspire to deprive another "of equal protection of the laws, or of equal privileges and immunities under the law," id. § 1985(3). However, we have already explained that § 1983 does not provide a remedy either for IDEA violations, see Diaz-Fonseca, 451 F.3d at 29, or for Rehabilitation Act or ADA violations, see Ramírez-Senda, 528

F.3d at 13 n.3.  We see no reason why § 1985 should be any different.

### III.

The impassioned advocacy of D.B.'s parents on D.B.'s behalf is laudable and understandable.  They have done much to advance their son's development.  However, appellees complied with the IDEA, and appellants have not raised any triable non-IDEA claims.  Accordingly, we must affirm the district court's entry of summary judgment in appellees' favor on all counts.  Each party shall bear its own costs.

So ordered.

**– Concurring Opinion Follows –**

**LYNCH**, <u>**Chief Judge**</u>, **concurring.** I join the opinion except for part II.B, which contains discussions entirely unnecessary to the holdings in the case.

I do join the holding that the affirmance of the district court's holding that there was no denial of a FAPE necessarily means that the there was no discriminatory denial of a FAPE and so counts 1 and 3 necessarily fail. I also join the holding that plaintiffs' claims of retaliation under the Rehabilitation Act and ADA fail for lack of any evidence "that the school system's legitimate, non-retaliatory explanations for its actions were pretextual." I also agree with the holding that the plaintiffs' evidence "failed to generate a genuine issue of material fact on the 'substantial or motivating factor' element of their First Amendment claim." Finally, I agree that neither § 1983 nor § 1985 creates substantive rights.

These holdings, of themselves, resolve all of plaintiffs' claims and require affirming the district court.

As to the remaining and extraneous discussions, I do not agree with the analysis, or that the court should say anything in this case, even in dicta, about these complex issues. The discussion of when non-IDEA claims overlap with IDEA claims is not necessary to any portion of the court's holding, nor does the scope of the IDEA's savings clause arise on these facts. Likewise, the conjuring up of hypotheticals far from the facts of this case is

not any part of the holding.  We should await opining on these matters until we must in fact address these issues in order to resolve future cases and where we have, unlike here, adequate briefing on these issues.